# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 2, 2012                Decided May 25, 2012

No. 11-7093

GSS GROUP LTD, ALSO KNOWN AS GLOBAL SECURITY SEALS
GROUP LTD,
APPELLANT

v.

NATIONAL PORT AUTHORITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01322)

*Stanley McDermott III*, pro hac vice, argued the cause for appellant. On the brief was *Charles B. Wayne*.

*Jessica L. Ellsworth* argued the cause for appellee. With her on the brief was *Lindsay D. Breedlove*.

Before: GARLAND, *Circuit Judge*, and WILLIAMS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Concurring opinion filed by *Senior Circuit Judge* WILLIAMS, with whom *Senior Circuit Judge* RANDOLPH joins.

RANDOLPH, *Senior Circuit Judge*: GSS Group, Ltd., brought this action to confirm a foreign arbitration award against the National Port Authority of Liberia. The district court dismissed the petition for lack of personal jurisdiction after concluding that the Port Authority did not have sufficient contacts with the United States. We affirm.

The Port Authority is a public corporation, organized under the laws of Liberia, responsible for the management, operation, and maintenance of Liberia's port facilities. It is wholly owned by the Liberian government, but, like many state-owned enterprises, operates at some remove from the government itself. The precise extent of this separation is a contested issue, taken up in greater detail below.

On June 9, 2005, the Port Authority entered into an agreement with GSS Group, a construction company incorporated in the British Virgin Islands and headquartered in Israel. The agreement called on GSS Group to build and operate a container park at the port of Monrovia, Liberia's capital. Several later amendments resulted in a final contract dated October 28, 2005. Although the parties intended the contract to run for twelve and one-half years, it remained in effect for only a few months.

The contract's early demise resulted from a change in Liberia's government. The National Transitional Government of Liberia – installed in 2003, during the aftermath of a four-year civil war – handed over control to a new, democratically-elected government in January 2006. Just a few weeks later, the new government determined that the contract was "null and void ab initio" because it had been awarded in violation of

competitive bidding requirements. Although GSS Group and the Port Authority had secured a single-source exemption from those requirements, the new government claimed that the waiver was "based on misrepresentation[s]" by GSS Group and "collusion" between GSS Group and Transitional Government officials.

GSS Group denied the new government's allegations and protested the contract's cancellation. After attempting to resolve the dispute informally, GSS Group invoked the contract's arbitration clause on March 15, 2006. That clause required the parties to submit disputes regarding the contract's "formation, validity, interpretation, performance, termination, enforcement or breach" to "binding arbitration" in London, England. The arbitration clause further stated that disputes would be decided "in accordance with the laws of England and Wales."

The Port Authority resisted GSS Group's arbitration demand. It maintained that parallel proceedings in the Liberian court system[1] prevented Lord Mustill – the London arbitrator selected by GSS Group – from adjudicating the dispute. Lord Mustill rejected this argument in a March 3, 2008, "Ruling on Jurisdiction" and went on to reach the merits of GSS Group's claim, without further participation by the Port Authority. Ultimately, he held that the Port Authority had breached the contract and was liable to GSS Group for $44,347,260 in

---

[1] The Liberian Public Procurement and Concessions Commission instituted proceedings on August 28, 2006, after GSS Group had invoked the arbitration clause. The Commission alleged that GSS Group and the Port Authority had both acted improperly, and that the contract was invalid under Liberian law. A Liberian court agreed to hear the case over GSS Group's objection. On February 8, 2008, the court held that the relevant portions of the contract were unenforceable.

damages – a sum representing GSS Group's project expenditures and future lost profits.

On June 16, 2009, GSS Group filed a petition in the United States District Court for the District of Columbia to confirm the London arbitration award. The Port Authority moved to dismiss the petition on several grounds, including lack of personal jurisdiction. Its personal jurisdiction argument focused on two main points. First, the Port Authority asserted that it was "legally separate from the Liberian government."[2] Memorandum of Points and Authorities, *GSS Grp. Ltd. v. Nat'l Port Auth.*, No. 1:09-cv-01322-PLF, at 16 (D.D.C. Oct. 30, 2009) ("NPA Memorandum"). Separate legal status was important since foreign sovereigns and their extensively-controlled instrumentalities are not "persons" under the Fifth Amendment's Due Process Clause – and thus have no right to assert a personal jurisdiction defense. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300-01 (D.C. Cir. 2005); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96-97 (D.C. Cir. 2002). In contrast to the Liberian government and its agencies, the Port Authority portrayed itself as an independent, albeit state-owned, corporation entitled to the full panoply of due process protections. Second, the Port Authority claimed that it could not be haled into the district court because it did not have "minimum contacts" with the United States. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853 (2011). This contention relied on the fact that the Port Authority had no offices or personnel in the United States and "ha[d] never engaged in commercial activity in the United States." NPA Memorandum at 20.

---

[2] This separation resulted from, among other things, the Port Authority's management of its own, unsubsidized finances; its ability to sue and be sued in its own name; and its independent property ownership.

GSS Group's reply did not contest the Port Authority's claim of juridical separateness or assert that the Port Authority had minimum contacts with the United States. Instead, it argued that the Port Authority satisfied all of the jurisdictional prerequisites set forth in the Foreign Sovereign Immunities Act. *See* 28 U.S.C. §§ 1330(b), 1603(a) & (b). The minimum contacts standard did not "trump" these requirements, GSS Group maintained, because foreign, state-owned corporations "do[] not have a constitutional status different from" their sovereign shareholders, "whether the[y] [are] independently managed or not." Memorandum in Opposition, *GSS Grp. Ltd. v. Nat'l Port Auth.*, No. 1:09-cv-01322-PLF, at 15 (D.D.C. Dec. 22, 2009).

The district court granted the motion to dismiss. *GSS Grp. Ltd. v. Nat'l Port Auth.*, 774 F. Supp. 2d 134 (D.D.C. 2011). It agreed that the Port Authority was subject to *statutory* personal jurisdiction under the Foreign Sovereign Immunities Act. *Id.* at 137. This did not end the inquiry, however, because the "question remain[ed] whether *the Constitution* permit[ted] the exercise of personal jurisdiction over the [Port Authority]." *Id.* (emphasis added). In answering this question, the court stressed the Port Authority's uncontested claim of juridical separateness. *Id.* at 139-41. Because GSS Group had not argued that the Port Authority was an agent of the Liberian government, the rule that closely-controlled instrumentalities have no due process rights did not apply. *Id.* at 139 (citing *TMR Energy*, 411 F.3d at 301); *see also id.* at 141.

Considering the Port Authority an independent entity, the district court concluded that it was a "person" covered by the Fifth Amendment. *Id.* at 139-41. "[C]ountless judicial opinions," the court explained, had afforded minimum contacts protections to foreign corporations. *Id.* at 138 (citing *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987);

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984)). Although none of these cases involved state-owned corporations, the court found no basis for treating them differently – at least in the absence of evidence that the corporation acted as an agent of its sovereign owner. *Id.* at 139-41 (distinguishing *Price*, 294 F.3d at 96-97). GSS Group had not attempted to demonstrate such a relationship, and did not identify any minimum contacts between the Port Authority and the United States.[3] *Id.* at 140-41. The court therefore held that the Due Process Clause prevented it from exercising personal jurisdiction over the Port Authority. *Id.*; *see also* FED. R. CIV. P. 12(b)(2).

In passing, the district court noted a possible doctrinal inconsistency between the *Helicopteros* line of civil procedure cases and other decisions holding that aliens without property or presence in the United States are not entitled to constitutional protection. *Id.* at 139; *see TMR Energy*, 411 F.3d at 302 n.\* (citing *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004)). It was "not clear" to the district court "why foreign defendants, other than foreign sovereigns, should be able to avoid the jurisdiction of United States courts by invoking the Due Process Clause when it is established in other contexts that nonresident aliens without connections to the United States typically do not have rights under the United States Constitution." 774 F. Supp. 2d at 139. Nonetheless, the court concluded that it was "in no

---

[3] In actions under the Foreign Sovereign Immunities Act, the relevant frame of reference for the minimum contacts analysis is the United States as a whole, rather than the specific jurisdiction in which the suit is filed (here, the District of Columbia). *See Theo. H. Davies & Co. v. Republic of the Marshall Islands*, 174 F.3d 969, 974 (9th Cir. 1998); *accord Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 127 & n.\* (D.C. Cir. 1999).

position to reject" the personal jurisdiction rule "enshrined in" *Helicopteros* and similar cases. *Id.*

GSS Group moved to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), based on three new arguments. The district court held that GSS Group had waived these arguments by failing to raise them in its opposition to the motion to dismiss. Accordingly, it denied the motion.

This appeal concerns both of the district court's orders. We review the order of dismissal *de novo*, *see Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 523 (D.C. Cir. 2001), and the Rule 59(e) decision for abuse of discretion, *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam).

I

GSS Group's petition arises under the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.*, which codifies the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 ("New York Convention"). The Convention obligates each contracting state to "recognize [foreign] arbitral awards as binding and enforce them in accordance with" local procedural law. *Id.* art. III. When the United States acceded to the Convention, it reserved the right to recognize and enforce "only those awards made in the territory of another Contracting State." 21 U.S.T. at 2566; *see* New York Convention art. I(3) (allowing such reservations). The United Kingdom of Great Britain and Northern Ireland, the site of the arbitral award, is a party to the Convention. Thus, while the dispute between GSS Group and the Port Authority has no connection to the United States, the arbitration award is eligible for enforcement here.

*See* 9 U.S.C. §§ 203, 207; *Termorio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 933-34 (D.C. Cir. 2007).

The petition also relies on the Foreign Sovereign Immunities Act's jurisdictional provisions. Under the Act, district courts have subject-matter jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a); *see also id.* § 1605(a)(6) (eliminating foreign states' sovereign immunity with respect to certain arbitration claims). The Act defines the term "foreign state" expansively. It includes not only foreign sovereigns, but also any "political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* § 1603(a). And the term "agency or instrumentality of a foreign state" in turn covers any foreign corporation "a majority of whose shares . . . [are] owned by a foreign state." *Id.* § 1603(b). Because the Port Authority is wholly owned by the Liberian government, it qualifies as an "agency or instrumentality," and thus a "foreign state" for subject-matter jurisdiction purposes.

The Port Authority's "foreign state" status has personal jurisdiction ramifications as well. The Foreign Sovereign Immunities Act specifies that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under" § 1603(a) "where service has been made under" § 1608. 28 U.S.C. § 1330(b). In other words, "under the FSIA, 'subject matter jurisdiction plus service of process equals personal jurisdiction.'" *Price*, 294 F.3d at 95 (quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987)). The Port Authority does not contest the manner in which it was served, and concedes that "[t]he FSIA supplies a statutory basis for [exercising] personal jurisdiction over" it. Appellee's Br. 22.

This brings us to the question presented: does the Constitution impose additional, non-statutory personal jurisdiction requirements, and if so, have those requirements been met here?

II

GSS Group's briefs dedicate significant attention to three arguments raised for the first time in its Rule 59(e) motion. The first of these arguments asserts that the Constitution is irrelevant because the Port Authority acted as the Liberian government's agent, and thereby lost all due process protection. *See TMR Energy*, 411 F.3d at 301-02. The second is that the district court should have permitted jurisdictional discovery before ruling on the motion to dismiss. The third is that if the Port Authority does have due process rights, the Federal Arbitration Act and the Foreign Sovereign Immunities Act provide it with all the process it is due. *Cf. Shaffer v. Heitner*, 433 U.S. 186, 210 n.36 (1977).

These contentions misapprehend the role of Rule 59(e).[4] "Rule 59(e) motions are aimed at reconsideration, not initial consideration." *District of Columbia v. Doe*, 611 F.3d 888, 896 (D.C. Cir. 2010) (quoting *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477 (6th Cir. 2007)). Accordingly, a "Rule 59(e) motion may not be used to . . . raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2810.1, at 127-28 (2d ed. 1995). GSS Group could have made all three of the arguments identified above in its opposition to the Port Authority's motion

---

[4] The Rule states: "Motion to Alter or Amend a Judgment. A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." FED. R. CIV. P. 59(e).

to dismiss, but elected not to do so. *See* 774 F. Supp. 2d at 139, 141. The arguments therefore are waived. *Doe*, 611 F.3d at 896.

GSS Group insists that its Rule 59(e) arguments are not waived because they were implicit in its original argument against the motion to dismiss. For support, GSS Group points to this footnote in its opposition memorandum:

> In the event, however, that this Court considers it material whether and to what extent the Government of Liberia controls the NPA's decision-making, then GSS reserves the right to conduct appropriate discovery to that end. The manner in which the NPA's new management cancelled the Contract strongly suggests that the Government does in fact control the NPA to a significant degree.

The district court did not abuse its discretion in rejecting this argument. *Firestone*, 76 F.3d at 1208. The footnote's "reservation" had no effect; "[t]o get discovery" GSS Group had to "ask for it." *Second Amendment Found.*, 274 F.3d at 525. As for the bare, unsubstantiated suggestion that the Liberian government controlled the Port Authority's actions, the court had no obligation to consider it. *See Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) (courts "need not consider cursory arguments made only in a footnote").

These shortcomings do not matter, GSS Group says, because the district court committed "legal error" in its jurisdictional analysis. We do not agree. The district court faithfully applied the same minimum contacts standard used in prior cases involving foreign corporations. *See* 774 F. Supp. 2d at 141 (citing *Asahi*, 480 U.S. at 102; *World-Wide Volkswagen*

*Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). GSS Group could have urged the court to apply a different standard, but it failed to do so in a timely fashion. It cannot avoid the consequences of that omission by labeling the district court's lack of telepathic powers as "legal error." *United States v. Hewlett*, 395 F.3d 458, 460 (D.C. Cir. 2005).

GSS Group also claims that "[a]ny question of waiver is . . . moot" because the district court "passed upon" its additional claims when it ruled on the Rule 59(e) motion. Appellant's Br. 22; *see Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707-08 (D.C. Cir. 2009). Although the court described one of GSS Group's new arguments as "profoundly unpersuasive," it did so only after explaining that the argument had been waived. A district court does not open the door to further consideration of a forfeited claim by giving an alternative, merits-based reason for rejecting it. *Cf. New Castle Cnty. v. Halliburton NUS Corp.*, 111 F.3d 1116, 1125 n.10 (3d Cir. 1997).

III

The sole argument GSS Group has preserved for our consideration is its claim that foreign, state-owned corporations have no due process rights. Distilled to its essence, GSS Group's point is that state-owned firms should be treated no differently than their sovereign shareholders.

In *Price*, we held that "foreign states are not 'persons' protected by the Fifth Amendment." 294 F.3d at 96. Several factors influenced this conclusion, including the Supreme Court's ruling that the States of the Union are not "persons" for Fifth Amendment purposes. *See id.* (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966)). We explained that "it would be highly incongruous to afford greater Fifth

Amendment rights to foreign nations, who are entirely alien to our constitutional system, than are afforded to the states, who help make up the very fabric of that system." *Id.* We also emphasized that foreign governments interact with the United States "as juridical equals on the level of international law and diplomacy *outside* the constitutional system." *Id.* at 97 (emphasis added) (quoting Lori Fisler Damrosch, *Foreign States and the Constitution*, 73 VA. L. REV. 483, 521 (1987)). These considerations put foreign sovereigns in a separate constitutional category from "private entities" – one in which "[t]he constitutional limits that have been placed on the exercise of personal jurisdiction" do not apply. *Id.* at 98-99.

GSS Group contends that the same logic applies to foreign, state-owned corporations. These entities, GSS Group claims, are just as "alien to our constitutional system" as the sovereigns that own them. Appellant's Br. 24-25. Thus, "[i]f a [foreign] sovereign does not have a 'due process trump,' neither does an alien state-owned agency or instrumentality." *Id.* at 26. Under this rule, the Port Authority would be unable to oppose enforcement of the arbitration award on jurisdictional grounds, because it would not have a constitutional status different from the Liberian government.

Binding precedent forecloses GSS Group's argument. Both the Supreme Court and this court have repeatedly held that foreign corporations may invoke due process protections to challenge the exercise of personal jurisdiction over them. *See, e.g.*, *Goodyear*, 131 S. Ct. at 2850-51, 2853; *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2785, 2789-90 (2011); *Asahi*, 480 U.S. at 113-16; *Helicopteros*, 466 U.S. at 413-14; *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091-92 (D.C. Cir. 2008); *Koteen v. Bermuda Cablevision, Ltd.*, 913 F.2d 973, 974-

75 (D.C. Cir. 1990).[5] In each of those instances, the foreign defendant was just as "alien to our constitutional system" as the Libyan government was in *Price*. 294 F.3d at 96. Yet the court did not hesitate to afford the defendant the full measure of due process protection.

It is true that these cases do not speak to the due process rights of state-owned corporations. We addressed that issue in *TMR Energy*, a case involving facts quite similar to those presented here. TMR Energy, a Cyprian development corporation, sought to enforce a foreign arbitration award against the State Property Fund of Ukraine, an agency responsible for Ukraine's privatization program.[6] *TMR Energy*, 411 F.3d at 298-99, 302. The State Property Fund conceded that it was an "agency or instrumentality" subject to statutory personal jurisdiction under the Foreign Sovereign Immunities Act. *Id.* at 299. It nevertheless moved to dismiss because it lacked minimum contacts with the United States, as required by the Fifth Amendment's Due Process Clause. *Id.* at 299-300 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

The State Property Fund was able to make this argument because *Price*'s limit on due process protections "applie[d] only to 'an actual foreign government.'" *Id.* at 300 (quoting *Price*, 294 F.3d at 99). Left open was the question "whether other entities that fall within the FSIA's definition of 'foreign state[,]' including corporations in which a foreign state owns a majority interest, could yet be considered persons under the Due Process Clause." *Price*, 294 F.3d at 99-100 (internal citation omitted).

---

[5] *But see infra* pp. 15-18.

[6] As in this case, the underlying dispute between the parties had no connection to the United States whatsoever. *See TMR Energy*, 411 F.3d at 298-99.

TMR Energy claimed that *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994), a case interpreting the Foreign Sovereign Immunities Act's service of process provisions, 28 U.S.C. § 1608 (a) & (b), provided the answer. *See TMR Energy*, 411 F.3d at 300. Because the State Property Fund allegedly qualified as a "foreign state" under *Transaero*, TMR Energy concluded that it had to be classified as a foreign state under the Due Process Clause as well. *Id.*

We rejected the argument, explaining that "a different analysis is indicated where the issue is not service of process under the FSIA but whether an agency or instrumentality of a foreign state is entitled to the protection of the [D]ue [P]rocess [C]lause." *Id.* at 301. To answer that question, we relied instead on the Supreme Court's decision in *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) ("*Bancec*"). *Id. Bancec* addressed the liability of a foreign, state-owned firm for the acts of its sovereign parent. *See* 462 U.S. at 613-14, 620-30. The Supreme Court held that "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations" required a baseline rule "that government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *Id.* at 626-27. In other words, state-owned firms generally are not liable for their government's actions. This presumption of separateness gives way only if a foreign "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," *id.* at 629, or when "broader equitable principle[s]" dictate that separate treatment "would work fraud or injustice," *id.* (quoting *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 322 (1939)).

*TMR Energy* extended the *Bancec* analysis to the constitutional realm, holding that *Bancec* "must govern" the

question whether a foreign instrumentality has due process rights under the Fifth Amendment. 411 F.3d at 301 (citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 446-47 (D.C. Cir. 1990)). The upshot of that rule is relatively straightforward. Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none. That was the result in *TMR Energy*, based on Ukraine's extensive legal, managerial, and financial control of the State Property Fund. *See* 411 F.3d at 302. On the other hand, if an instrumentality does not act as an agent of the state, and separate treatment would not result in manifest injustice, *see Bancec*, 462 U.S. at 629, the instrumentality will enjoy all the due process protections available to private corporations. Far from being "irrelevant," as GSS Group claims, the extent of a state-owned corporation's juridical independence plays a dispositive role in the constitutional analysis. *See TMR Energy*, 411 F.3d at 301; *see also Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 400-01 (2d Cir. 2009) (adopting the *TMR Energy* rule).

GSS Group responds that "this Court has not hitherto suggested much less held that an agency or instrumentality loses due process protection only if, as in *TMR Energy*, it is controlled by its foreign-state parent." Appellant's Reply Br. 8. The implication is that there are *other* reasons why a foreign instrumentality might not fall within the Fifth Amendment's protective sweep. For instance, a footnote in *TMR Energy* suggested, while "express[ing] no view upon the question," that "[i]t is far from obvious that even an independent [foreign instrumentality] would be entitled to the protection of the [F]ifth [A]mendment." 411 F.3d at 302 n.*.

The footnote cites two cases, each of which held that aliens without property or presence in the sovereign territory of the United States have no constitutional rights. *Id.* (citing *Verdugo-Urquidez*, 494 U.S. at 271; *Jifry*, 370 F.3d at 1182). Similar cases abound. *See, e.g.*, *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001); *Johnson v. Eisentrager*, 339 U.S. 763, 783-84 (1950); *Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009), *vacated and remanded*, 130 S. Ct. 1235 (2010) (per curiam), *reinstated*, 605 F.3d 1046 (D.C. Cir. 2010); *32 Cnty. Sovereignty Comm. v. Dep't of State*, 292 F.3d 797, 799 (D.C. Cir. 2002); *Harbury v. Deutch*, 233 F.3d 596, 603-04 (D.C. Cir. 2000), *rev'd on other grounds sub nom. Christopher v. Harbury*, 536 U.S. 403 (2002); *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 22 (D.C. Cir. 1999); *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) (per curiam). The district court in this case observed that these decisions, if taken to their logical conclusion, might mean that *no* foreign entity could assert a due process–personal jurisdiction defense, at least so long as it lacked property or presence within the United States. *See* 774 F. Supp. 2d at 139. Others have also suggested that the decisions just cited could be seen as in conflict with the rule expressed in the *Helicopteros* line of civil procedure cases; if a foreign entity has no constitutional rights, its lack of minimum contacts is immaterial. *See* Austen L. Parrish, *Sovereignty, Not Due Process: Personal Jurisdiction Over Nonresident Alien Defendants*, 41 WAKE FOREST L. REV. 1, 28-33 (2006); Gary A. Haugen, *Personal Jurisdiction and Due Process Rights for Alien Defendants*, 11 B.U. INT'L L.J. 109, 115-17 (1993); *see also TMR Energy*, 411 F.3d at 301-02 & n.\*. After all, the "personal jurisdiction requirement is not a structural limitation on the power of courts," *Price*, 294 F.3d at 98, but "a function of the individual liberty interest preserved by the Due Process Clause," *Nicastro*, 131 S. Ct. at 2798 (quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 n.10 (1982)).

Yet it may be that the cases can be reconciled. When a foreign corporation is summoned into court, it is being forced to defend itself. To do so, the corporation must appoint a representative to act for it – that is, an attorney. *See Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 166 n.1 (D.C. Cir. 1990). In opposing personal jurisdiction on due process grounds the corporation, through its attorney, makes itself present. *See Int'l Shoe*, 326 U.S. at 316. And since it has been forced to appear in the United States, at least for that limited purpose,[7] it

---

[7] At common law, the exercise of personal jurisdiction was tied to physical presence. *See Burnham v. Superior Court*, 495 U.S. 604, 610-14 (1990) (plurality opinion). A "general appearance" of any kind, such as a motion to dismiss for failure to state a claim, made a nonresident defendant present and thus subject to the court's authority. *See Pollard v. Dwight*, 8 U.S. (4 Cranch) 421, 428-29 (1808); *Gerber v. Riordan*, 649 F.3d 514, 521 (6th Cir. 2011) (Moore, J., concurring). And in the case of a corporate defendant, the corporation made itself present through the appearance of its attorney. *See St. Louis & S.F. Ry. Co. v. McBride*, 141 U.S. 127, 128, 130 (1891). The special appearance doctrine evolved as an exception to the general appearance rule. It enabled a nonresident defendant to contest the court's jurisdiction "without thereby subjecting [it]self to the power of the court generally." *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871, 874 (3d Cir. 1944) (en banc); *see also Harkness v. Hyde*, 98 U.S. 476, 479 (1878). The doctrine relied on a legal fiction; although counsel appeared on the defendant's behalf, courts allowed defendants to escape the consequences of the appearance "as a matter of grace" and "sound public policy." *Orange Theatre*, 139 F.3d at 874.

Rule 12 of the Federal Rules of Civil Procedure abolished the distinction between special appearances and general appearances. 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1344 (3d ed. 2004). This relieved nonresident defendants of the need "to appear specially or employ any particular set of words to challenge a federal court's personal jurisdiction." *Id.*

is entitled to the protection of the due process clause as interpreted in *International Shoe* and later decisions involving foreign corporate defendants. *Cf. Zadvydas*, 533 U.S. at 693. An alternative reconciliation might lie in the idea that when a United States court exercises jurisdiction over a foreign corporate defendant it inflicts damage on that defendant (at a minimum in the form of legal costs, but possibly in the form of a judgment) *in the United States*.

We need not embrace this line of reasoning or resolve the possible conflict described above, for three reasons. First, GSS Group waived any reliance on *Verdugo-Urquidez* and its progeny at oral argument. *See* Oral Arg. Recording at 11:50-12:55, 22:25-22:46. Second, *Bancec* is the exclusive means for determining whether a foreign, state-owned corporation is a "person" for Fifth Amendment purposes. *TMR Energy*'s holding that *Bancec* "must govern" is a precedent binding on us. 411 F.3d at 301. Third, the Supreme Court has reaffirmed as recently as last year that foreign corporations are entitled to due process protection, despite the fact they have no meaningful connection to the United States. *See, e.g.*, *Goodyear*, 131 S. Ct. at 2853; *Nicastro*, 131 S. Ct. at 2787. In fact, the entirely foreign nature of the defendants in *Goodyear*, *Nicastro*, *Asahi*, and *Helicopteros* is what enabled them to prevail. *See, e.g.*, *Goodyear*, 131 S. Ct. at 2854. These decisions leave the unmistakable impression that United States courts may not exercise personal jurisdiction over a foreign corporation unless

---

But it did not eliminate the logical consequence of a defensive court appearance: presence within the forum. A defendant is just as "present" when it files a Rule 12 motion as it is when it makes a special appearance. While this does not affect the question of personal jurisdiction, it seems to bear on the separate and antecedent question whether a party has due process rights.

the corporation has "minimum contacts" with the relevant forum. *See id.* at 2853.

The bottom line is this: the Port Authority claimed to be an independent juridical entity in its motion to dismiss, and GSS Group failed to contest that characterization. GSS Group's omission left intact the *Bancec* presumption, which, under *TMR Energy*, guarantees the Port Authority treatment as a separate "person" entitled to due process protection. That protection includes the right to assert a minimum contacts defense. GSS Group has not identified *any* connection between the Port Authority and the United States; indeed, its brief concedes that none exists. The district court therefore correctly dismissed the petition for lack of personal jurisdiction.

*Affirmed.*

WILLIAMS, *Senior Circuit Judge*, with whom *Senior Circuit Judge* RANDOLPH joins, concurring: I concur in the court's opinion and judgment but write separately to express concern about our decision in *TMR Energy v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), which extended *First National City Bank v. Banco Para el Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611 (1983), to a wholly new domain. The result was to constitutionalize an issue quite unnecessarily.

In *Bancec* the Court considered whether a U.S. firm, sued in New York by a bank wholly owned by the Cuban government, could claim as a "set off" the losses inflicted on it by the Cuban government's seizure of its Cuban assets. The Court held that it could do so, invoking a set of corporate veil-piercing principles. While "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such," 462 U.S. at 626-27, that norm could be overcome under a variety of circumstances—namely, where the "corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," *id*. at 629, and where honoring the distinction "would work fraud or injustice" or "defeat legislative policies," *id*. at 629-30.

At the time we decided *TMR*, three arguably relevant lines of authority were outstanding. First was *Bancec*'s veil-piercing decision in the context of U.S. firms' efforts to set off foreign states' obligations against claims by a state-owned entity. Second was our own decision in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), holding that a foreign *state* was not a "person" for purposes of the due process clause and its requirement of "minimum contacts" for personal jurisdiction. In doing so we pointed out that foreign states were the juridical equals of the United States, and that if a state perceived that it had been

improperly dragged into a U.S. court, it would have available to it "a panoply of mechanisms in the international arena through which to seek vindication or redress." *Id*. at 98. Given that the federal courts themselves had "relied on principles of comity and international law to protect foreign governments in the American legal system," *id*. at 97, we held that "[t]hese mechanisms [the ones available to foreign states in the international arena], *not the Constitution*, set the terms by which sovereigns relate to one another," *id*. at 98 (emphasis added).

Third were Supreme Court applications of the due process clauses' "minimum contacts" analysis to *private* foreign corporations in determining whether they could be subject to U.S. courts' jurisdiction. See, e.g., *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102 (1987).

In *TMR Energy* we noted both (1) that the cases applying minimum contacts analysis to foreign corporations appeared to rest on a hitherto unchallenged *assumption* of the due process clauses' applicability, and (2) that in light of decisions by this court and the Supreme Court that aliens without property or presence in the United States do *not* receive constitutional protections, see, e.g., *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), it was "far from obvious that [a wholly independent foreign state-owned corporation] would be entitled to the protection of the fifth amendment." 411 F.3d at 302 n.*. But, partly because of TMR's failure to argue the point and partly because of the approach we took (finding against the foreign entity on other grounds, described below), we had no need to resolve either point.

Instead, we looked at the foreign entity in question through the lens of *Bancec*. We posed the question "whether the SPF [the State Property Fund of Ukraine] has a constitutional status different from that of the State of

Ukraine." *Id*. at 301. Finding that "the State of Ukraine had plenary control over the SPF," we ruled that the SPF, "like its principal . . . is not a 'person' for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal juridiction of the district court." *Id*. at 301-02.

But we never really explained the metamorphosis of *Bancec*, which arose as the solution to a set-off issue, into a constitutional doctrine for foreign state-owned entities. That extension yields several anomalies. While *Bancec* explicitly took note of "legislative policies," 462 U.S. at 630, constitutionalization of the issue of suing foreign state-owned corporations stands as a potential obstacle to solutions that Congress might find sensible. Our own decision in *Price*, noting the availability of diplomatic measures, invites us as a country (courts as well as the political branches) to take note of the behavior of foreign states and the structure of international relations. Some countries have adopted "statutes that authorize their courts to exercise jurisdiction over a foreign defendant whenever the defendant's nation would do the same in analogous situations." Austen L. Parrish, *Sovereignty, Not Due Process: Personal Jurisdiction over Nonresident Alien Defendants*, 41 WAKE FOREST L. REV. 1, 49 (2006). A U.S. statute mimicking such foreign solutions, however sensible as a negotiating strategy, would run afoul of *TMR*'s constitutionalization of the issue—as applied, for instance, to corporations of a state that allowed suits against our corporations regardless of minimum contacts. State-owned corporations, of course, will often have access to the diplomatic mechanisms alluded to in *Price*, and their use of that access might well precipitate the sort of negotiated solutions contemplated there.

More generally, we reasoned in *Price* that extending due process protections to foreign states would "frustrate the United States government's clear statutory command" to

subject foreign states to the jurisdiction of the federal courts under some circumstances. 294 F.3d at 98-99. In the Foreign Sovereign Immunities Act Congress defined circumstances when foreign states and their instrumentalities may be subject to the jurisdiction of United States courts, see 28 U.S.C. §§ 1602, 1605, and it is not at all clear why that determination should not be given full effect.

These concerns suggest that in a suitable case it may be valuable for courts to reconsider both the merits of the assumption in *Asahi Metal* and kindred cases that private foreign corporations deserve due process protections, and (perhaps more significantly) the application of that assumption to entities owned by a foreign state but not subject to the state's plenary control or otherwise treated as a state.

This said, if the Supreme Court were to find the due process clauses inapplicable to the question of jurisdiction over private foreign corporations, or if we were to do the same for state-owned but not state-equivalent entities, it would not follow ineluctably that they could henceforth be exposed to the United States courts' jurisdiction regardless of minimum contacts. Quite apart from the instances where the FSIA itself imposes requirements substantially equivalent to minimum contacts, see 28 U.S.C. § 1605(a)(2); see also *S & Davis Intern., Inc. v. Republic of Yemen*, 218 F.3d 1292, 1304 (11th Cir. 2000) (noting similarity of the standards), courts might well extend the current practice on the ground of its substantial duration (most clearly in the case of private corporations), but subject to any congressional provisions to the contrary. Such an approach would be quite different from the constitutional straightjacket that appears to prevail currently.