## *PRELIMINARY PRINT*

## VOLUME 605 U. S. PART 1
### PAGES 223–237

# OFFICIAL REPORTS

OF

# THE SUPREME COURT

JUNE 5, 2025

Page Proof Pending Publication

REBECCA A. WOMELDORF

REPORTER OF DECISIONS



NOTICE: This preliminary print is subject to formal revision before the bound volume is published. Users are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

## CC/DEVAS (MAURITIUS) LTD. ET AL. *v.* ANTRIX CORP. LTD. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 23–1201.   Argued March 3, 2025—Decided June 5, 2025*

Devas Multimedia Private Ltd. signed a satellite-leasing agreement with Antrix Corporation Ltd., which is owned by the Republic of India for use by its Department of Space.   But when the Indian Government later determined it needed more satellite capacity for itself, Antrix terminated the contract under its *force majeure* clause.   The parties proceeded to arbitration.   After unanimously concluding that Antrix had breached the contract, the arbitral panel awarded Devas $562.5 million in damages plus interest.   Devas then petitioned the United States District Court for the Western District of Washington to confirm the award.   The District Court confirmed the award and entered a $1.29 billion judgment against Antrix.

The Ninth Circuit reversed, finding that personal jurisdiction was lacking.   Under the Foreign Sovereign Immunities Act of 1976 (FSIA), "[p]ersonal jurisdiction over a foreign state shall exist" whenever (1) an immunity exception applies, and (2) the foreign defendant has been properly served.   § 1330(b).   The Ninth Circuit did not question that Antrix is a "foreign state" under the FSIA, that an immunity exception applies, and that Devas effectuated proper service.   Yet bound by Circuit precedent, the panel explained that the Act imposes an additional requirement: "personal jurisdiction under the FSIA [also] requires a traditional minimum contacts analysis" as set forth in *International Shoe Co.* v. *Washington*, 326 U. S. 310, and its progeny.   Applying that standard, the court concluded it could not exercise personal jurisdiction over Antrix because Antrix lacked sufficient suit-related contacts with the United States.

*Held*: Personal jurisdiction exists under the FSIA when an immunity exception applies and service is proper.   The FSIA does not require proof of "minimum contacts" over and above the contacts already required by the Act's enumerated exceptions to foreign sovereign immunity. Pp. 232–237.

———————

*Together with No. 24–17, *Devas Multimedia Private Ltd.* v. *Antrix Corp. Ltd. et al.*, also on certiorari to the same court.

(a) The FSIA's personal-jurisdiction provision imposes two substantive requirements. First, the district court must have subject-matter jurisdiction, which the FSIA grants whenever an enumerated immunity exception applies. Second, service must be made under the FSIA's specialized service-of-process rules. When both criteria are satisfied, the statute declares that personal jurisdiction "shall exist." Accordingly, the most natural reading of the operative text is that personal jurisdiction over a foreign sovereign is automatic whenever an immunity exception applies and service of process has been accomplished. Notably absent from the provision is any reference to "minimum contacts." And the Court declines to add what Congress left out, as the FSIA was supposed to "clarify the governing standards," not hide the ball. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 488.

Of course, the FSIA's immunity exceptions themselves require varying degrees of suit-related domestic contact before a case may proceed. But to the extent these exceptions satisfy *International Shoe*, it is because the exceptions Congress wrote happen to meet that standard, not because the Act's personal-jurisdiction provision secretly incorporated the Court's due-process cases.

The Act's structure reinforces this reading. The FSIA "comprehensively regulat[es] the amenability of foreign nations to suit in the United States." *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U. S. 134, 141. The immunity and jurisdictional provisions form the foundation of that comprehensive scheme, and Congress deliberately tied them together: whenever an exception applies, the FSIA strips immunity and grants jurisdiction. Reading an additional minimum-contacts requirement into only one of the FSIA's tethered immunity and jurisdictional provisions would weaken the link Congress forged and create a gap in the Act's otherwise "comprehensive framework." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 699. Pp. 232–235.

(b) The Ninth Circuit's two contrary arguments cannot override the plain meaning of the FSIA's personal-jurisdiction provision. First, the fact that one of the immunity exceptions contains language resembling the minimum-contacts test says little about whether a jurisdictional provision located elsewhere categorically imposes that test. Second, the legislative history cited by the Ninth Circuit shows only that Congress believed the contacts set forth in the Act's then-existing immunity exceptions satisfy due process, not that the personal-jurisdiction provision silently includes an atextual minimum-contacts requirement. Pp. 235–236.

(c) Antrix's alternative arguments—that the Fifth Amendment itself requires a showing of minimum contacts, that the claims at issue do not fall within the FSIA's arbitration exception, and that the suit should be

Opinion of the Court

dismissed under *forum non conveniens*—were not addressed below by the Ninth Circuit. This Court declines to address them in the first instance. Pp. 236–237.

Reversed and remanded.

ALITO, J., delivered the opinion for a unanimous Court.

*Aaron M. Streett* argued the cause for petitioner in No. 24–17. With him on the briefs was *Christopher E. Tutunjian*. *Matthew D. McGill* argued the cause for petitioners in No. 23–1201. With him on the briefs in both cases were *Jacob T. Spencer, Ankita Ritwik, David W. Casazza, Brian C. McCarty, Anne Champion*, and *Malaika Eaton*.

*Acting Solicitor General Harris* argued the cause for the United States as *amicus curiae* urging reversal in both cases. On the brief were *Solicitor General Prelogar, Deputy Solicitor General Kneedler, Anthony A. Yang, Sharon Swingle*, and *Lewis S. Yelin*.

*Carter G. Phillips* argued the cause for respondents in both cases. With him on the brief were *Gregory M. Williams, Kwaku A. Akowuah*, and *Madeleine Joseph.*†

JUSTICE ALITO delivered the opinion of the Court.

Under the Foreign Sovereign Immunities Act of 1976 (FSIA), 28 U. S. C. §§ 1330, 1602 *et seq.*, foreign states are

---

†Briefs of *amici curiae* urging reversal in both cases were filed for the Chamber of Commerce of the United States of America et al. by *Peter B. Rutledge, Jennifer B. Dickey, Jonathan D. Urick*, and *Ryan P. Meyers*; for the United States Council for International Business by *Viren Mascarenhas* and *D. Jason File*; for George A. Bermann by *Alexander A. Yanos* and *Kristen K. Bromberek*; for Andrea K. Bjorklund et al. by *James E. Berger, Samantha Chaifetz*, and *Charlene C. Sun*; and for Mark B. Feldman by *Robert K. Kry* and *Mark B. Feldman, pro se.*

Briefs of *amici curiae* urging affirmance in both cases were filed for the Republic of India by *Andrea J. Menaker, Nicolle Kownacki*, and *Weiqian Luo;* for the Republic of Zimbabwe by *Rodney Q. Smith II*; and for Paul B. Stephan by *Jeffrey T. Green*.

*Seth P. Waxman* and *Eric L. Hawkins* filed a brief for Ingrid (Wuerth) Brunk as *amicus curiae* in both cases.

generally immune from suit in United States courts, but the Act creates several exceptions. See §§ 1604, 1605–1607. And when an exception applies, § 1330(a) of the FSIA vests federal courts with "original jurisdiction" over such claims.

This suit concerns the FSIA's neighboring personal-jurisdiction provision. It provides that "[p]ersonal jurisdiction over a foreign state shall exist" whenever (1) an exception to foreign sovereign immunity applies, and (2) the foreign defendant has been properly served. § 1330(b). In the decision below, however, the Ninth Circuit imposed a third requirement: a plaintiff must also prove that the foreign state has made "minimum contacts" with the United States sufficient to satisfy the jurisdictional test set forth in *International Shoe Co.* v. *Washington*, 326 U. S. 310, 316 (1945), and its progeny. Because the Ninth Circuit's additional requirement goes beyond the text of the FSIA, we reverse.

I

A

Like so many disputes, this one began with two companies and a contract. Antrix Corporation Ltd. (Antrix) is organized under Indian law and is owned by the Republic of India for use by its Department of Space. In Antrix's words, it serves as "the commercial arm of Indian Space Research Organisation"—a division within the Department of Space—and is tasked with "promot[ing] and commercially market[ing] the products and services emanating from the Indian Space Programme." No. 2:18–cv–01360 (WD Wash., Dec. 21, 2018), ECF Doc. 24–1, p. 43. The Indian Government finances most of Antrix's operations and appoints much of its leadership. See App. to Pet. for Cert. 15a.

In January 2005, Antrix signed a satellite-leasing agreement with Devas Multimedia Private Ltd. (Devas), a privately owned Indian company incorporated to develop satellite-based telecommunications technology. Under the agreement, Antrix would build and launch a new satellite

network into geostationary orbit*—specifically, at the 83°E orbital slot—and lease some of that network's capacity back to Devas. Devas, in turn, would use its leased satellite capacity to provide multimedia broadcasting services across India.

The agreement proceeded as expected for several years. Antrix obtained project approval from the Indian Government and clearance from the International Telecommunications Union, the arm of the United Nations responsible for allocating orbital satellite space among member states. For its part, Devas secured the requisite internet- and television-provider licenses, brought on investors, and paid Antrix the contractually required fees. And as satellite construction neared completion, the parties performed several successful trials of Devas's newly developed software and infrastructure.

In February 2011, however, Antrix and Devas hit a snag. Just before the satellites were scheduled for launch, the Indian Government determined it needed greater satellite capacity for itself and could no longer lease its limited S-band spectrum (the type Antrix and Devas planned to use) for commercial use. So, at the behest of government officials, Antrix terminated the agreement with Devas. Citing the contract's *force majeure* clause, Antrix explained that India's new satellite-allocation policy prevented it from continuing performance on the contract.

But Devas thought Antrix was liable for the financial fallout. So Devas invoked the contract's arbitration provision, commenced proceedings, and argued the purported *force*

---

*"Satellites in geostationary orbit (GEO) fly above Earth's equator, moving from west to east, exactly matching Earth's rotation . . . . GEO is ideal for satellites that need to stay fixed above a specific location, such as telecommunication satellites, allowing antennas on Earth to stay in a constant position, always pointing at the satellite." European Space Agency, Types of Orbits (Mar. 30, 2020), https://www.esa.int/Enabling_Support/Space_Transportation/Types_of_orbits.

*majeure* was self-induced.  The three-member arbitral panel ruled unanimously for Devas on September 14, 2015. Applying Indian law, the panel concluded Antrix had wrongfully terminated the contract and awarded Devas $562.5 million in damages plus interest.

After successfully confirming the arbitration award in France and the United Kingdom, Devas sought to do the same in the United States.  See 2 J. Grenig, Domke on Commercial Arbitration § 41:1, p. 467 (3d ed. 2025) ("[C]onfirmation of an arbitration award finalizes the award and makes the award a judgment of the court").  In September 2018, Devas petitioned the United States District Court for the Western District of Washington to confirm the award, citing the FSIA's so-called arbitration exception as the basis for federal jurisdiction.  See 28 U. S. C. § 1605(a)(6).  Antrix moved to dismiss, arguing, *inter alia*, that the District Court lacked jurisdiction.

B

For much of American history, foreign states and their instrumentalities enjoyed near total immunity from suit in our courts.  See *Hungary* v. *Simon*, 604 U. S. 115, 118–119 (2025).  This posture reflected the venerable international law principle that states are independent sovereign entities, and it encouraged others to respect the sovereignty of the United States in their courts.  *Bolivarian Republic of Venezuela* v. *Helmerich & Payne Int'l Drilling Co.*, 581 U. S. 170, 179 (2017).  Notably, this immunity was not statutorily or constitutionally required.  Instead, we have long understood foreign sovereign immunity as "a matter of grace and comity," so judges historically "'deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction' over particular actions against foreign sovereigns and their instrumentalities." *Republic of Austria* v. *Altmann*, 541 U. S. 677, 689 (2004) (quoting *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983)).  In practice, that usually entailed the State

Department filing a case-specific "'suggestion of immunity'" whenever a foreign sovereign was sued, and when that occurred, the court would abide by the suggestion. *Samantar* v. *Yousuf*, 560 U. S. 305, 311 (2010) (quoting *Ex parte Peru*, 318 U. S. 578, 581 (1943)).

Beginning in the mid-20th century, the Executive Branch adopted a more nuanced stance toward sovereign immunity, but its new approach "proved troublesome." *Verlinden*, 461 U. S., at 487. Specifically, the State Department declared in 1952 it would no longer suggest immunity in "cases arising out of a foreign state's strictly commercial acts." *Ibid.* While this shift brought the United States into parity with the emerging international consensus, it also provoked tension and confusion. "[F]oreign nations often placed diplomatic pressure on the State Department," and, "[o]n occasion, political considerations led to suggestions of immunity in cases where immunity would not have been available." *Ibid.* Furthermore, in instances where the State Department simply failed to file any suggestion, courts were forced to determine immunity based on standards that were "neither clear nor uniformly applied." *Id.*, at 488.

Congress addressed the problem in 1976 by enacting the FSIA, now "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 434 (1989). Instead of case-by-case determinations that were governed by fuzzy legal standards and prone to manipulation, the FSIA imposes a bright-line rule: foreign states and their instrumentalities are immune from suit unless one of the Act's enumerated exceptions applies. 28 U. S. C. §1604; see §§1605–1607. Exceptions include claims based on commercial activities with a specified nexus to the United States, §1605(a)(2), claims based on torts that have caused domestic personal injury or property damage, §1605(a)(5), claims based on certain expropriations, §1605(a)(3), and several others.

The Act also waives immunity for suits to confirm arbitration awards. § 1605(a)(6). The arbitration exception applies in four statutorily defined contexts, including where the "agreement or award" is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." § 1605(a)(6)(B). The United States, for instance, has acceded to the New York Convention, which requires it to enforce certain awards issued abroad. See Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U. S. T. 2517, T. I. A. S. No. 6997; 9 U. S. C. §§ 201–208. In such instances, and when the FSIA is otherwise satisfied, the arbitration exception would also apply.

Whenever an FSIA immunity exception applies, jurisdiction usually follows. That is because the Act's jurisdictional provision, 28 U. S. C. § 1330, pegs both subject-matter and personal jurisdiction to the exceptions. Subsection (a) of that provision grants district courts "original jurisdiction" over "any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . under sections 1605–1607," which are the FSIA's immunity exceptions. And subsection (b) provides for personal jurisdiction "as to every claim for relief over which the district courts have jurisdiction under subsection (a)"—*i. e.*, for every claim subject to an immunity exception—and "where service has been made under section 1608." See *Republic of Sudan* v. *Harrison*, 587 U. S. 1, 4–5, 8–13 (2019) (discussing § 1608's specialized service-of-process rules).

C

Once this dispute arrived in federal court in this country, a dramatic series of events unfolded. Upon satisfying itself that jurisdiction was proper under the FSIA's arbitration exception, the District Court confirmed the award and entered a $1.29 billion judgment against Antrix. Yet before Devas

could collect, an Indian corporate-law tribunal found that Devas—an Indian company—had procured the Devas–Antrix agreement by fraud; so the tribunal appointed an Indian Government official to seize control of Devas and wind down its affairs.  Quickly thereafter, several Devas shareholders and an American subsidiary attempted to intervene in the federal proceedings below and to enforce the judgment themselves.  Successfully so: over Devas's and Antrix's objections, they intervened, secured post-judgment discovery to locate Antrix's domestic assets, and registered the judgment in the Eastern District of Virginia, where Antrix held executable assets.  Then, adding one last wrinkle to an already complex dispute, the High Court of New Delhi set aside the arbitration award based largely on the Indian corporate-law tribunal's earlier fraud determination.

Several appeals followed, and a Ninth Circuit panel found that personal jurisdiction was lacking and therefore reversed the District Court's orders confirming and registering the award.  See No. 20–36024 etc. (Aug. 1, 2023), App. to Pet. for Cert. 3a–8a.  The court did not question "that for purposes of the FSIA, Antrix is a 'foreign state,' service has been made, and an enumerated exception applies."  *Id.*, at 4a.  Yet bound by Circuit precedent, the panel explained that the Act imposes an additional requirement: "personal jurisdiction under the FSIA [also] requires a traditional minimum contacts analysis," *ibid.*, which is a reference to our jurisdictional due-process test first developed in *International Shoe*, 326 U. S., at 316.  See *Walden* v. *Fiore*, 571 U. S. 277, 283–286 (2014).  Applying that standard, the court concluded that Antrix lacked sufficient suit-related contacts with the United States and that the lawsuit must therefore be dismissed.

We granted certiorari to decide whether the FSIA requires proof of "minimum contacts" before a court can exercise personal jurisdiction over a foreign state.  See 603 U. S. 949 (2024).  We hold it does not.

## II

The facts of this suit are complex, but the legal question we address today is straightforward. The text and structure of the FSIA demonstrate that Congress did not require "minimum contacts" over and above the contacts already required by the Act's enumerated exceptions to foreign sovereign immunity.

## A

We start, as always, with the relevant statutory text. Here, that is the FSIA's personal-jurisdiction provision, 28 U. S. C. § 1330(b). It provides:

> "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject-matter] jurisdiction under subsection (a) where service has been made under section 1608 of this title."

As noted earlier, this provision imposes two substantive requirements—one related to subject-matter jurisdiction, the other related to service of process. See *supra*, at 230. First, "district courts have [subject-matter] jurisdiction under subsection (a)" when any of the FSIA's immunity exceptions applies. See *Amerada Hess*, 488 U. S., at 434–435. Second, "service has been made under section 1608" when a plaintiff complies with the FSIA's specialized service-of-process rules. See *Harrison*, 587 U. S., at 4–5, 8–13. When both criteria are satisfied, the statute declares that personal jurisdiction "shall exist," and, "as in other contexts, the use of the word 'shall' creates an obligation impervious to judicial discretion." *Smith* v. *Spizzirri*, 601 U. S. 472, 476 (2024) (some internal quotation marks omitted).

Thus, the most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is "automatic" whenever (1) "an exception to immunity applies" and (2) "service of process has been accomplished." *Samantar*, 560 U. S., at

324, n. 20; accord, *Verlinden*, 461 U. S., at 485, n. 5; Restatement (Fourth) of Foreign Relations Law of the United States § 451, Comment *b* (2017).   Or phrased in even simpler terms, "subject matter jurisdiction plus service of process equals personal jurisdiction." *GSS Group Ltd.* v. *National Port Auth.*, 680 F. 3d 805, 811 (CADC 2012) (internal quotation marks omitted).

Notably absent from § 1330(b) is any reference to "minimum contacts."   And we decline to add in what Congress left out: the FSIA was supposed to "clarify the governing standards," not hide the ball.   *Verlinden*, 461 U. S., at 488; cf. *Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 618 (1992) (refusing to read an "unexpressed requirement" into the FSIA).

Although nothing in the text of § 1330(b) requires a minimum-contacts analysis, that does not mean Congress dispensed altogether with proof of contact between the foreign state and the United States.   In order for subject-matter jurisdiction to exist under the FSIA, an exception to immunity must apply.   See § 1330(a).   And the FSIA's immunity exceptions themselves require varying degrees of suit-related domestic contact before a case may proceed. See §§ 1605–1607.   Some exceptions call for considerable domestic nexus, such as "rights in immovable property situated in the United States," "commercial activity carried on in the United States by the foreign state," or "commercial activity of the foreign state elsewhere" that "causes a direct effect in the United States."   §§ 1605(a)(2)–(4); see *Verlinden*, 461 U. S., at 490–491.   Others, like § 1605A's terrorism exception, are satisfied by less direct or pervasive contact with the territory of the United States, as the parties acknowledge. See Brief for Petitioner Devas Multimedia Private Limited 26, 31–32; Brief for Petitioner CC/Devas (Mauritius) Limited et al. 48–49; Brief in Opposition 7.   To the extent that some or all FSIA exceptions satisfy *International Shoe*, it is only

because the exceptions Congress wrote happen to meet that standard, not because § 1330(b) secretly incorporated our jurisdictional due-process cases.

The Act's structure reinforces this straightforward reading of § 1330(b)'s text. As we have recognized on many occasions, the FSIA "'comprehensively regulat[es] the amenability of foreign nations to suit in the United States.'" *Republic of Argentina* v. *NML Capital, Ltd.*, 573 U. S. 134, 141 (2014) (quoting *Verlinden*, 461 U. S., at 493). The Act's immunity and jurisdictional provisions are the foundation of this comprehensive scheme, and Congress deliberately tied them together. Namely, whenever a §§ 1605–1607 exception applies, § 1604's immunity falls away, and § 1330 grants jurisdiction. See s*upra*, at 229–230; *Amerada Hess*, 488 U. S., at 434–435, and n. 3 (detailing how immunity and jurisdiction "work in tandem"); *Verlinden*, 461 U. S., at 485, n. 5, 489, and n. 14 (same); *Price* v. *Socialist People's Libyan Arab Jamahiriya*, 294 F. 3d 82, 89 (CADC 2002) (observing that "the FSIA collapses subject matter jurisdiction, *in personam* jurisdiction, and sovereign immunity into a single inquiry"). And, in the narrow instances where Congress did *not* want for immunity and jurisdiction to be coextensive with the enumerated exceptions, it said so. See §§ 1330(a)–(b) (limiting jurisdiction to "nonjury civil action[s]," "for relief in personam," where "service has been made under section 1608").

Instead of enforcing these provisions as written, the Ninth Circuit read an additional requirement into one—and only one—of the FSIA's tethered immunity and jurisdictional provisions. As a practical matter, that would weaken the link Congress forged among foreign sovereign immunity, subject-matter jurisdiction, personal jurisdiction, and the enumerated exceptions; it would also create a gap in the Act's otherwise "comprehensive framework." *Altmann*, 541 U. S., at 699. "We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply." *Jama* v. *Immigration and Customs En-*

*forcement*, 543 U. S. 335, 341 (2005). And we are all the more reluctant to do so where, as here, reading such a requirement into the statute would upset the "carefully calibrated" system Congress chose. *Turkiye Halk Bankasi A.S.* v. *United States*, 598 U. S. 264, 273 (2023).

B

The Ninth Circuit based its contrary interpretation on a strange statutory argument and on the FSIA's legislative history. Neither overrides § 1330(b)'s plain meaning.

As noted by the court below, the Ninth Circuit first read § 1330(b) to "requir[e] satisfaction of the traditional minimum contacts standard" in an earlier precedent, *Thos. P. Gonzalez Corp.* v. *Consejo Nacional de Produccion de Costa Rica*, 614 F. 2d 1247, 1255 (1980). *Gonzalez* offered two pieces of support for that conclusion. First, one of the enumerated immunity exceptions requires proof of a "direct effect" in the United States, § 1605(a)(2), which *Gonzalez* "interpreted as embodying the minimum contacts standard of *International Shoe,*" *id.*, at 1255. But see *Rote* v. *Zel Custom Mfg. LLC*, 816 F. 3d 383, 394 (CA6 2016) ("[T]he 'direct effect' requirement does not incorporate the 'minimum contacts' test"). Second, *Gonzalez* then read "[t]he legislative history of the Act"—particularly the House Judiciary Committee Report's discussion of personal jurisdiction—to "confir[m] that the reach of § 1330(b) does not extend beyond the limits set by the *International Shoe* line of cases." 614 F. 2d, at 1255, and n. 5. But see *Epic Systems Corp.* v. *Lewis*, 584 U. S. 497, 523 (2018) ("[L]egislative history is not the law").

Even accepting *Gonzalez*'s cited authority on its own terms, we do not find either step of the Ninth Circuit's analysis compelling. The fact that one of the immunity exceptions contains language resembling the minimum-contacts test says little about whether a jurisdictional provision located elsewhere categorically imposes that test. Each immunity exception should be interpreted according to the text

Congress enacted, see, *e. g.*, *Simon*, 604 U. S., at 126–128, and so should § 1330(b).

To the extent it is relevant, the legislative history *Gonzalez* cites is not to the contrary. True, the House Report says, "[t]he requirements of minimum jurisdictional contacts and adequate notice are embodied in the [personal-jurisdiction] provision." H. R. Rep. No. 94–1487, p. 13 (1976). But then the Report explains that this "embodiment" of due process comes from the Act's immunity exceptions and service-of-process rules, not a minimum-contacts requirement silently emanating from § 1330(b). "[E]ach of the immunity provisions in the bill, sections 1605–1607, requires some connection between the lawsuit and the United States," and, the Report notes, § 1330(b)'s plain text "incorporat[es] these jurisdictional contacts by reference." *Ibid.* The Report then makes the critical point: "*These immunity provisions, therefore, prescribe the necessary contacts* which must exist before our courts can exercise personal jurisdiction. . . . [S]ection 1330(b) also satisfies the due process requirement of adequate notice by prescribing that proper service be made under section 1608 of the bill." *Id.*, at 13–14 (emphasis added); see also *Rote*, 816 F. 3d, at 398 (White, J., concurring) ("[The House Report] shows only that Congress believed that the contacts set forth in the immunity provisions satisfy due-process requirements. . . . It is a separate question whether Congress was correct in its assumption"). Thus, the FSIA's legislative history leads to the same result as § 1330(a)'s text: personal jurisdiction rises and falls based on whether an immunity exception applies and the plaintiff has effectuated proper service.

## III

Antrix does not defend the Ninth Circuit's reasoning. See Brief for Respondent 1; Tr. of Oral Arg. 36–37. Instead, it raises various alternative reasons why we should affirm the decision below notwithstanding its misreading of the FSIA.

Opinion of the Court

Namely, Antrix contends that the Fifth Amendment's Due Process Clause itself requires a showing of minimum contacts before a federal court can exercise personal jurisdiction over a company owned by a foreign sovereign. Antrix also argues that the claims at issue in this dispute do not fall within the FSIA's arbitration exception, properly conceived, and that the suit should be dismissed under *forum non conveniens.*

We decline to answer those questions today. The Ninth Circuit relied exclusively on its interpretation of the FSIA's personal-jurisdiction provision, so that court has not yet addressed Antrix's alternative arguments. "[A]nd, for that reason, neither shall we." *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 175 (2004); accord, *United States* v. *Oakland Cannabis Buyers' Cooperative*, 532 U. S. 483, 494 (2001). Of course, Antrix is welcome to litigate these contentions on remand consistent with principles of forfeiture and waiver.

\* \* \*

Personal jurisdiction exists under § 1330(b) of the FSIA when an immunity exception applies and service is proper. Because the Ninth Circuit required more, we reverse the judgment below and remand the suit for further proceedings consistent with this opinion.

*It is so ordered.*

REPORTER'S NOTE

The attached opinion has been revised to reflect the usual publication and citation style of the United States Reports.  The revised pagination makes available the official United States Reports citation in advance of publication.  The syllabus has been prepared by the Reporter of Decisions for the convenience of the reader and constitutes no part of the opinion of the Court.  A list of counsel who argued or filed briefs in this case, and who were members of the bar of this Court at the time this case was argued, has been inserted following the syllabus.  Other revisions may include adjustments to formatting, captions, citation form, and any errant punctuation.  The following additional edits were made:

p. 226, line 6 from bottom: "See App. to Pet. for Cert. 15a" is inserted after "leadership"

p. 228, line 4 from bottom: "foreign" is inserted before "sovereigns"