Bugliotti v. The Republic of Argentina

# In the
# United States Court of Appeals
## for the Second Circuit

August Term, 2025
No. 24-2950

Euclides Bartolome Bugliotti, Maria Cristina De Biasi,
Roxana Ines Rojas, Denise Lauret, Maria Carla Gonano,
*Plaintiffs-Appellants,*

*v.*

The Republic of Argentina,
*Defendant-Appellee.* *

On Appeal from a Judgment of the United States District Court for
the Southern District of New York.

ARGUED: SEPTEMBER 17, 2025
DECIDED: MARCH 9, 2026

Before: CHIN, NARDINI, and KAHN, *Circuit Judges.*

---

* The Clerk of Court is respectfully directed to amend the caption as set
forth above.

Plaintiffs-Appellants are bondholders who sued the Republic of Argentina to recover principal payments owed on defaulted sovereign bonds. The bondholders had brought a previous action against the Republic in the United States District Court for the Southern District of New York (Loretta A. Preska, *District Judge*), which dismissed their claims for a variety of reasons—primarily based on the bondholders' lack of authority to sue on the bonds under Argentine law—and we ultimately affirmed. The bondholders then obtained authorization from an Argentine court to sue to enforce the bonds and filed another complaint in New York. The district court again dismissed the complaint, on two grounds. First, the district court held that all of the bondholders' claims were barred under New York's six-year statute of limitations for contract claims. According to the court, N.Y. C.P.L.R. § 205(a), a "savings statute" that permits an action to be re-filed within six months after its dismissal, did not preserve the bondholders' claims because their prior suit had been dismissed for lack of personal jurisdiction. Nor could the bondholders invoke the tolling provisions in executive orders issued by the Governor of New York during the COVID pandemic, because they had failed to demonstrate equitable entitlement to such tolling. Second, the district court held that the bondholders were collaterally estopped from relitigating issues that had formed the basis of the district court's previous dismissal. On appeal, we agree with the district court that § 205(a) does not apply, but we hold that New York's COVID-era tolling provisions do not require any showing of equitable entitlement. Accordingly, some (but not all) of the bondholders' claims are timely. We further hold that collateral estoppel does not bar the bondholders from relitigating certain questions that we did not reach in our previous affirmance of the district court's dismissal; and that under Argentine law, the bondholders now have authority to sue on the bonds. Accordingly,

we AFFIRM IN PART and VACATE IN PART the judgment of the district court and REMAND for further proceedings.

---

MICHAEL C. SPENCER, Milberg Coleman Bryson Phillips Grossman, PLLC, Garden City, NY, *for Plaintiffs-Appellants*.

RAHUL MUKHI (Carmine D. Boccuzzi Jr., *on the brief*), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, *for Defendant-Appellee.*

---

WILLIAM J. NARDINI, *Circuit Judge*:

This appeal is the latest chapter in the long-running saga of creditors trying to recover over $35 million in defaulted principal payments on Argentine sovereign bonds. The Plaintiffs-Appellants (the "Bondholders")[1] had brought a previous action against the Defendant-Appellee, the Republic of Argentina (the "Republic"), in the United States District Court for the Southern District of New York (Loretta A. Preska, *District Judge*). The district court dismissed those claims for a variety of reasons—primarily based on the Bondholders' lack of authority to sue on the bonds under Argentine law—and we ultimately affirmed. The Bondholders then obtained authorization

---

[1]As discussed in more detail below, the bonds were acquired by the current Plaintiffs-Appellants or their predecessors in interest. For convenience, we will refer to them collectively as the "Bondholders."

from an Argentine court to sue to enforce the bonds and filed another complaint in New York.

The district court again dismissed the complaint, on two grounds. First, the district court held that all of the Bondholders' claims were barred under New York's six-year statute of limitations for contract claims. According to the court, N.Y. C.P.L.R. § 205(a), a "savings statute" that permits an action to be re-filed within six months after its dismissal, did not preserve the Bondholders' claims because their prior suit had been dismissed for lack of personal jurisdiction. Nor could the Bondholders invoke the tolling provisions in executive orders issued by the Governor of New York during the COVID pandemic, because the Bondholders had failed to demonstrate equitable entitlement to such tolling. Second, the district court held that the Bondholders were collaterally estopped from relitigating issues that had formed the basis of the district court's previous dismissal.

On appeal, we agree with the district court that § 205(a) does not apply, but we hold that New York's COVID-era tolling provisions do not require any showing of equitable entitlement. Accordingly, some (but not all) of the Bondholders' claims are timely. We further hold that collateral estoppel does not bar the Bondholders from relitigating certain questions that we did not reach in our previous affirmance of the district court's dismissal; and that under Argentine law, the Bondholders now have authority to sue on the bonds. Accordingly, we AFFIRM IN PART and VACATE IN PART the judgment of the district court and REMAND for further proceedings.

4

## I.    Background

Over a span of time, the Bondholders[2] in this case acquired $35,818,000 worth of bonds issued by the Republic. Their holdings include bonds from two different series: $30,299,000 of "GD65 Bonds" and $5,519,000 of "AR16 Bonds." The GD65 Bonds had a maturity date of February 21, 2012, and the AR16 Bonds had a maturity date of January 30, 2017. The Republic issued both sets of bonds pursuant to a "Fiscal Agency Agreement" dated October 19, 1994 (the "FAA" and bonds thereunder the "FAA Bonds"). The FAA contained a number of provisions that made the Republic amenable to suit in New York for disputes over the FAA Bonds, including a consent to jurisdiction in "any action arising out of or based on the Securities or this Agreement by the holder of any Security" in "any state or federal court in The City of New York" and appointment of a registered agent for service in New York. Joint App'x at 68. The Republic also waived "any immunity from the jurisdiction of any such court to which it might otherwise be entitled in any action arising out of or based on

---

[2] Plaintiffs-Appellants in this case are Euclides Bartolomé Bugliotti, Maria Cristina de Biasi, Roxana Inés Rojas, Denise Lauret, and Maria Carla Gonano. Bugliotti and non-party Hugo Lauret were business partners who sold a large wholesale business in 1998 and decided to invest part of the proceeds in Argentine bonds. Bugliotti and his wife, de Biasi, purchased $27,252,000 of GD65 Bonds and $5,511,000 of AR16 Bonds. Hugo Lauret purchased $3,047,000 of GD65 Bonds and $8,000 of AR16 Bonds, which passed to his three heirs—Rojas, Lauret, and B.L.G., a minor—following his death in January 2015. Plaintiffs-Appellants Rojas, Lauret, and Gonano (appearing on behalf of her son, B.L.G.) presently maintain interests in the Bonds purchased by Hugo Lauret.

5

the Securities or this Agreement by the holder of any Security." *Id.* at 69.

In August 2001, as the Republic was approaching another debt crisis, it launched a "Tax Credit Program" under Presidential Decree Number 1005/2001. Under this program, bondholders could deposit their FAA Bonds in trust with an Argentine clearing system, Caja de Valores S.A. ("Caja"). In exchange for their FAA bonds, participants would receive two different types of certificates. One set, called "custody certificates" ("*Certificados de Custodia*," or "*CCs*"), corresponded to the principal value of their bonds and would be payable on the bonds' maturity date. The other set, called "tax credit certificates" ("*Certificados de Crédito Fiscal*," or "*CCFs*"), corresponded to the value of outstanding interest payments. If the Republic missed an interest payment, the Bondholders could exchange a *CCF* to get an Argentine tax credit equal in value to the unpaid interest.

In November 2001, the Bondholders opted into the Tax Credit Program. They deposited their FAA Bonds in trust with Caja, and received *CCs* and *CCFs* corresponding in value to the principal and interest payable on the Bonds. The rights and obligations of the parties to these trusts were memorialized in identical Trust Agreements (the "Trust Agreements"), with the Bondholders as the "Principal" or "Trustor" and Caja as the "Trustee." Section 2.1 of these Agreements provides that the trusts "shall be governed by . . . Law 24[,]441" of Argentina, which in turn states that "[t]he trustee has standing to exercise all actions necessary to defend the trust assets,

6

both against third parties and against the beneficiary." Joint App'x 77, 100, 462. Section 16 also contains the following arbitration clause:

> For all purposes of this Agreement, the Parties agree to resolve their disputes through an arbitration procedure, for which purpose they submit to the Permanent Arbitration Tribunal of the Buenos Aires Stock Exchange and the application of its regulations, waiving any other jurisdiction that may correspond to them.

*Id.* at 105.

On December 24, 2001, the Republic declared a moratorium on paying both principal and interest on sovereign debt and stopped making payments on the FAA Bonds. Because the Bondholders had enrolled in the Tax Credit Program, they exchanged their outstanding *CCFs* for tax credits in place of the unpaid interest until their FAA Bonds matured on February 21, 2012, and January 30, 2017. But when the FAA Bonds reached their maturity dates, the Republic failed to pay out the outstanding principal value represented by the *CCs*.

The Bondholders then embarked on a long series of legal proceedings to compel the Republic to pay the principal on the FAA Bonds.

After initial litigation in Argentine courts proved unsuccessful, the Bondholders—like many other investors in Argentine sovereign debt before them—turned to the federal courts in New York. On December 20, 2017, the Bondholders sued the Republic for non-payment of the FAA Bonds in the United States District Court for the

7

Southern District of New York. The Bondholders relied on the FAA's consent to jurisdiction in New York and waiver of sovereign immunity to establish both personal and subject matter jurisdiction. Shortly before bringing suit, the Bondholders and Caja also entered into a certification recognizing that the Bondholders would sue to recover on the FAA Bonds in New York and that Caja would not be responsible for pursuing this action.

On January 15, 2019, the district court dismissed the Bondholders' complaint. The court concluded that once the Bondholders deposited the FAA Bonds with the trustee pursuant to the Tax Credit Program and received *CCs* and *CCFs* in exchange, it was the trustee—that is, Caja—that now owned the bonds. Absent an ownership interest in the FAA Bonds, the Bondholders themselves could not invoke the FAA's provisions on sovereign immunity, service, and jurisdiction that would allow the suit against the Republic to go forward in New York. *Bugliotti v. Republic of Argentina* ("*Bugliotti I*"), No. 17-CV-9934 (LAP), 2019 WL 586091, at *3–*4 (S.D.N.Y. Jan. 15, 2019).

On appeal, this Court affirmed in part, vacated in part, and remanded. *Bugliotti v. Republic of Argentina* ("*Bugliotti II*"), 952 F.3d 410, 415 (2d Cir. 2020). As relevant here, we held that the operative question was not who owned the FAA Bonds, but whether Argentine law authorized the Bondholders to bring suit to enforce them and therefore to invoke the jurisdictional provisions contained in the FAA. *Id.* at 411, 413.

8

On remand, the district court again dismissed the Bondholders' complaint. *Bugliotti v. Republic of Argentina* ("*Bugliotti III*"), No. 17-CV-9934 (LAP), 2021 WL 1225971, at *9 (S.D.N.Y. Mar. 31, 2021). Looking to Argentine trust law, the district court concluded that Caja had the exclusive right to sue to enforce the FAA Bonds and that it had not conferred this right on the Bondholders. *Id.* at *7–*8. The district court also concluded that Argentine law required the FAA Bonds "to be reassembled before being enforced." *Id.* at *8. That is, the Bondholders had to return the unredeemed *CCs* (the certificates for principal payments) to the trust, and to deposit into the trust an amount of money equivalent to the tax credits that the Bondholders had received pursuant to the *CCFs*. However, the court also discussed a potential "alternative remedy" to reassembly: "obtaining authorization from the [Argentine] judge to exercise an action instead of the trustee." *Id.* at *9

The Bondholders appealed, and we affirmed. *Bugliotti v. Republic of Argentina* ("*Bugliotti IV*"), 67 F.4th 102, 107 (2d Cir. 2023). We explained:

> [E]ven if we assume arguendo that Caja had the authority to delegate its enforcement right to [the Bondholders], and that [the Bondholders] were not required to first reassemble the bonds before bringing this action, we still cannot find that [the Bondholders] are entitled to bring suit to recover the bonds under Argentine law, since there is no evidence that Caja ever made such a delegation.

*Id.* at 106.

9

Following this Court's decision, the Bondholders sought authorization from Commercial Court No. 9 in Buenos Aires, Argentina (the "Commercial Court") for their American lawsuit. Caja participated in the hearing and did not object to the Bondholders' application. On June 21 and July 12, 2023, the Commercial Court entered orders authorizing the Bondholders to "exercise and/or continue the relevant actions and all necessary acts for that purpose . . . in order to sue the issuer for the collection of the bonds or public securities that constitute the underlying assets of the mentioned trusts and their accessories[.]" Joint App'x at 43–44, 55.

With the Commercial Court's authorization in hand, the Bondholders refiled their complaint in the Southern District of New York on July 28, 2023.

For a third time, the district court dismissed the Bondholders' complaint. *Bugliotti v. Republic of Argentina* ("*Bugliotti V*"), No. 23-CV-6588 (LAP), 2024 WL 4349273, at *8 (S.D.N.Y. Sept. 30, 2024). The district court concluded that the Bondholders' new action was time-barred by the six-year statute of limitations for contract claims under N.Y. C.P.L.R. § 213(2). According to the court, N.Y. C.P.L.R. § 205(a), a "savings statute" under New York law that permits an action to be re-filed within six months after its dismissal, did not save the Bondholders' claims because their prior suit had been dismissed for lack of personal jurisdiction. Nor could the Bondholders invoke the tolling provisions in executive orders issued by the Governor of New York during the COVID pandemic, because they had failed to demonstrate equitable entitlement to such tolling. The district court

10

further held that, even if the claims were timely, the Bondholders were collaterally estopped from relitigating issues of jurisdiction, including whether reassembly was required, which had formed the basis of the district court's previous dismissal in *Bugliotti III*.

This appeal followed.

## II.    Standard of Review

This Court reviews *de novo* a district court's grant of a motion to dismiss, accepting the allegations in the complaint as true and drawing all reasonable inference in favor of the plaintiff. *United States v. EZ Lynk, SEZC*, 149 F.4th 190, 198 (2d Cir. 2025). It similarly reviews *de novo* both conclusions of law regarding jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and determinations of foreign law. *Harvey v. Permanent Mission of Republic of Sierra Leone to United Nations*, 97 F.4th 70, 76 (2d Cir. 2024) (FSIA); *Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 14 (2d Cir. 2023) (foreign law).

## III.    Discussion

This appeal raises several principal issues. As a threshold matter, we must determine whether the Bondholders' claims are time-barred, in light of New York's "savings statute," N.Y. C.P.L.R. § 205(a), as well as COVID-era executive orders issued by the Governor of New York. To the extent the claims are not barred by the statute of limitations, we consider whether the Bondholders are collaterally estopped from relitigating whether Argentine law

11

authorizes them to sue on the FAA Bonds (and therefore to establish jurisdiction in the district court).  If collateral estoppel does not bar their arguments, we then address (a) whether the Bondholders' failure to reassemble their FAA Bonds bars this suit; and (b) if not, whether the Bondholders nevertheless lack authority to enforce the FAA Bonds because the Commercial Court's authorization was ineffective.  We consider each issue in turn.

### A. Statute of Limitations

Under New York law, claims for breach of contract are subject to a six-year statute of limitations.  N.Y. C.P.L.R. § 213(2). [3]  The Bondholders filed this action on July 28, 2023, more than six years after both the AR16 and GD65 Bonds matured.[4]  The Bondholders argue, however, that the limitations period on their claims has not run because of New York's "savings statute," N.Y. C.P.L.R. § 205(a), which—subject to certain conditions—lets plaintiffs re-file an action within six months after its dismissal.  This argument, if valid, would render timely the Bondholders' claims on all their Bonds because the Bondholders initiated their prior suit on December 20, 2017, before the statute of limitations on either the AR16 or GD65 Bonds expired.  In the alternative, the Bondholders argue that the limitations period

---

[3] The FAA provides that New York law governs the Agreement.  The parties also agree that the Bondholders' claims are subject to New York's six-year statute of limitations on contract claims.

[4] The Bondholders' AR16 Bonds matured on January 30, 2017, and the subsequent six-year period ended on January 30, 2023.  Similarly, the Bondholders' GD65 Bonds matured on February 21, 2012, and the following six-year period terminated on February 21, 2018.

on their claims was tolled for 228 days by the COVID Orders. This latter argument, if correct, would save the Bondholders' claims for recovery on the AR16 Bonds. But it would not preserve their claims on the GD65 Bonds, because the limitations period for those expired in February 2018, long before the COVID Orders were in place.

### 1. N.Y. C.P.L.R. § 205(a)

Under N.Y. C.P.L.R. § 205(a), "[i]f an action is timely commenced and is terminated . . . the plaintiff . . . may commence a new action upon the same transaction or occurrence or series of transactions or occurrences within six months after the termination" so long as the new action would have been timely when the prior action was commenced and service is effected within the same six-month period. N.Y. C.P.L.R. § 205(a). The statute lists certain exceptions to this rule. As relevant here, the savings provision does not apply if an action was previously dismissed for "failure to obtain personal jurisdiction over the defendant." *Id.*

In *Bugliotti III*, the district court granted the Republic's motion to dismiss the Bondholders' then-operative complaint under Federal Rules of Civil Procedure 12(b)(1), (2), and (5). 2021 WL 1225971, at *1. The district court reasoned that because Caja had not conferred the right to bring suit on the Bondholders, as required under the Trust Agreements and Argentine law, the Bondholders lacked standing to enforce the FAA Bonds. 2021 WL 1225971, at *7–9. Consequently, the Bondholders could not "invoke the 1994 FAA Bonds' service of process and jurisdictional provisions under the FSIA." *Id.* at *9. On

appeal, this Court noted that it reviewed *de novo* the dismissal of the complaint for lack of both personal and subject-matter jurisdiction. *Bugliotti IV*, 67 F.4th at 104.

The Bondholders now argue that the district court's dismissal of the complaint in *Bugliotti III* was based only on lack of standing, not lack of personal jurisdiction. As a result, the Bondholders contend, they can invoke N.Y. C.P.L.R. § 205(a) to cure their statute of limitations defect.

The Bondholders' argument misapprehends the nature of the district court's jurisdiction over the Republic in this matter. The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *CC/Devas (Mauritius) Limited v. Antrix Corp. Ltd.*, 605 U.S. 223, 229 (2025) (internal quotation marks omitted). Personal jurisdiction exists under the FSIA where any of the statute's exceptions to immunity applies and service of process has been accomplished. *Id.* at 232. One such exception is where a "foreign state has waived its immunity either explicitly or by implication." *Cap. Ventures Int'l v. Republic of Argentina*, 552 F.3d 289, 293 (2d Cir. 2009) (quoting 28 U.S.C. § 1605(a)(1)).

In the operative complaint at issue in *Bugliotti III*, the Bondholders relied on the Republic's waiver of sovereign immunity and consent-to-jurisdiction clause in the FAA to establish personal jurisdiction. However, the district court in *Bugliotti III* found that the Bondholders were unable to enforce the FAA Bonds, 2021 WL 1225971, at *7–*8, meaning that they could not invoke the

14

jurisdictional provisions contained in the FAA. The ruling thus undermined the Bondholders' sole basis for asserting that the district court had personal jurisdiction over the Republic. Although the district court referred to the Bondholders' lack of "standing" in its decision, *id.* at *7, the true defect was lack of jurisdiction: The district court was speaking to the Bondholders' lack of standing to enforce the consent-to-jurisdiction terms of the FAA, not to a lack of Article III or statutory standing. This conclusion was made even more clear by the district court's express invocation of Federal Rule of Civil Procedure 12(b)(2) (which provides for dismissal for "lack of personal jurisdiction") as one of the bases for dismissing the complaint. *See id.* at *1. The district court's dismissal in *Bugliotti III* was thus grounded, at least in part, in a lack of personal jurisdiction. Accordingly, the Bondholders cannot invoke the six-month relation-back provision of § 205(a) to make their present complaint timely.

Further, we are unpersuaded by the Bondholders' argument that § 205(a) applies despite any "curable defect," which they argue is the situation here. As a preliminary matter, the text of § 205(a) plainly states that the statute does not apply where the prior action was dismissed for lack of personal jurisdiction; it does not distinguish between curable and non-curable defects. *See* N.Y. C.P.L.R. § 205(a). But even assuming § 205(a) does make such a distinction, the Bondholders' argument would still fail. In *Yonkers Contracting Co. v. Port Authority Trans-Hudson Corp.*, 93 N.Y.2d 375 (1999), the New York Court of Appeals held that § 205(a) does not apply to an action that was previously dismissed for the "curable defect" of failure to

15

establish that the defendant waived its sovereign immunity. *Id.* at 379 (holding that sovereign immunity had not been waived, where statute required "timely suit as an integral part of its waiver of sovereign immunity"). This Court later stated that the outcome in *Yonkers Contracting* was, in part, a result of the plaintiff's right to sue arising from a "statutory waiver of sovereign immunity." *Hakala v. Deutsche Bank AG*, 343 F.3d 111, 114 (2d Cir. 2003). We reasoned that "[g]iven the fact that a sovereign entity was free to make itself completely immune to suit by simply declining to waive its immunity, the harsh result of disallowing the remedial provision of § 205(a) was far less unfair." *Id.* at 116. The same rationale applies here. Because *Bugliotti III* held that the Bondholders could not take advantage of the waiver of sovereign immunity in the FAA Bonds (which in turn would have granted personal jurisdiction), 2021 WL 1225971, at *9, § 205(a) does not apply to the Bondholders' claims.

## 2. The COVID Orders

We agree with the Bondholders, however, that New York's COVID-era executive orders tolled the statute of limitations between March 20 and November 3, 2020, for a total of 228 days.

On March 20, 2020, then-New York Governor Andrew Cuomo issued Executive Order 202.8, declaring that "[i]n accordance with the directive . . . to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement . . . of any legal action . . . is hereby *tolled* from the date of this executive order until April 19, 2020." N.Y. Exec. Order

16

202.8 (emphasis added). The Governor later issued eight executive orders that repeatedly extended the March 20, 2020, Order. *See* N.Y. Exec. Order Nos. 202.14, 202.28, 202.38, 202.48, 202.55, 202.55.1, 202.60, 202.67.

Since then, the New York Court of Appeals has consistently characterized these Orders as "tolling" the statute of limitations. *Favourite Ltd. v. Cico*, 42 N.Y.3d 250, 260–61 (2024); *see also Jaime v. City of New York*, 41 N.Y.3d 531, 537 n.2 (2024) ("the governor issued an executive order containing a provision that *tolled* all limitations periods due to the COVID-19 pandemic") (emphasis added). All four New York Appellate Departments have also stated that these Orders operate to toll the applicable New York-law limitations periods. *Zak v. Bronx Park Phase I Preserv., LLC*, 237 A.D.3d 654, 655 (1st Dep't 2025) ("the three-year statute of limitations was tolled by executive orders"); *Baker v. 40 Wall St. Holdings Corp.*, 226 A.D.3d 637, 638 (2d Dep't 2024) (holding that executive orders "constitute a toll of the filing deadlines") (internal quotation marks omitted); *Matter of Roach v. Cornell Univ.*, 207 A.D.3d 931, 932 (3d Dep't 2022) (holding that executive orders constituted a "toll" that suspended the running of the limitations period); *Harden v. Weinraub*, 221 A.D.3d 1460, 1462 (4th Dep't 2023) (characterizing executive orders as creating a "toll"). This Circuit, too, has echoed the New York Court of Appeals' characterization of the COVID Orders as tolling the relevant periods. *See In re Nordlicht*, 115 F.4th 90, 113 (2d Cir. 2024).

Adopting this characterization, we conclude that the COVID Orders, like all other tolling provisions, extended the window for the

17

Bondholders to commence this action by the length of the 228-day tolled period. *See Bermudez Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492, 505 n.8 (2020) ("A toll does not extend the statute of limitations indefinitely but merely suspends the running of the applicable statute of limitations for a finite and, in this instance, readily identifiable time period . . . ."). Thus, the Bondholders' deadline to file claims over the AR16 Bonds was pushed back 228 days from January 30, 2023, to September 15, 2023. Because the Bondholders initiated suit on July 28, 2023, their claims on the AR 16 Bonds are timely. By contrast, the tolling provided by the COVID Orders does not save the claims over the GD65 Bonds because the limitations period on these claims expired in 2018, before the COVID Orders were in place. Put another way, because the statute of limitations had already run on the GD65 Bonds, there was no longer a limitations period to be tolled on those claims by the time that the Governor issued his executive orders.

The district court reached a different conclusion on the effect of the COVID Orders, reasoning that the Bondholders could not invoke "equitable tolling" because they had not explained how the COVID-19 pandemic impacted their ability to file claims, and indeed they were litigating this matter while the COVID Orders were in place. *Bugliotti V*, 2024 WL 4349273, at *5. The district court erred, however, in analyzing the COVID Order under an equitable tolling framework. Equitable tolling is a discretionary exercise of a court's equitable powers that "prevent[s] unfairness to a plaintiff who is not at fault for lateness in filing" when the movant demonstrates "some extraordinary circumstance stood in her way" and that "she has been

18

pursuing her rights diligently." *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 142 (2d Cir. 2025) (internal citation and quotation marks omitted). New York's COVID Orders do not, however, condition their applicability upon any equitable showing by a party. Instead, the COVID Orders provide automatic relief from limitations periods on New York-law claims for a set period of time. *See* N.Y. Exec. Order 202.8.

We are unpersuaded by the Republic's contention that the COVID Orders extended the limitations period only for claims that expired while the Orders were in effect. The text of the March 20, 2020, Order does not restrict tolling to limitations periods that expired while the Order was in place. N.Y. Exec. Order 202.8. Nor, as a general matter, does tolling work that way. *See Bermudez Chavez*, 35 N.Y.3d at 505 n.8. Indeed, the Second Department has expressly rejected the argument put forth by the Republic, and we are persuaded that its holding accurately reflects New York law. *Baker*, 226 A.D.3d at 638.

Nor do we discern any merit in the Republic's contention that then-Governor Cuomo lacked authority to toll the statute of limitations. Executive Law Section 29-a provides the Governor with authority to "temporarily *suspend* specific provisions of any statute, local law, ordinance, or orders . . . if compliance with such provisions would prevent, hinder, or delay action necessary to cope with [a state disaster emergency]." N.Y. Exec. Law § 29-a(1) (emphasis added). Suspensions of statutory requirements under Section 29-a "may provide for the alteration or modification of" these requirements. *Id.*

19

§ 29-a(2)(d).  The First and Second Departments have both held that the authority to "alter[]" or "modify[]" statutory requirements includes tolling limitations periods, and they have confirmed the Governor's authority to do so under Section 29-a.  *Murphy v. Harris*, 210 A.D.3d 410, 411 (1st Dep't 2022); *Brash v. Richards*, 195 A.D.3d 582, 584–85 (2d Dep't 2021).  This outcome strikes us as correct, and these decisions allow us to predict with confidence that the New York Court of Appeals would rule the same way if asked.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 74 (2d Cir. 2012).

In sum, although the Bondholders cannot take advantage of N.Y. C.P.L.R. § 205(a), the COVID Orders extended the limitations period on the AR16 Bonds by 228 days.  As a result, the Bondholders' claims to recover on the AR16 Bonds are timely and the district court erred in declining to apply the COVID Orders to those claims.

## B.  The Bondholders' Authority to Enforce the FAA Bonds

The Bondholders next argue that the district court erred in holding that collateral estoppel barred relitigation of whether they had authority to sue to enforce the FAA Bonds—in particular, whether they needed to reassemble their Bonds before bringing suit. In their view, the district court's determination on this point in *Bugliotti III* has no preclusive effect because this Court affirmed *Bugliotti III* on alternative grounds.  The Bondholders further contend that Argentine law does not actually require reassembly of the FAA Bonds, and that the new orders of the Commercial Court authorize

20

them to proceed with the litigation in New York.  We agree with the Bondholders in each respect.

### 1. Collateral Estoppel

"[I]f an appellate court considers only one of a lower court's alternative bases for its holding, affirming the judgment without reaching the alternative bases, only the basis that is actually considered can have any preclusive effect in subsequent litigation." *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 754 (2d Cir. 1996); *accord In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011).  In so holding, we have echoed the Restatement of Judgments: "If the appellate court upholds one of [multiple] determinations as sufficient and refuses to consider whether or not the other is sufficient and accordingly affirms the judgment, the judgment is conclusive as to the first determination."  Restatement (Second) of Judgments § 27 cmt. o (1982), *cited in In re Peters*, 642 F.3d at 386.

The district court's holding on reassembly in *Bugliotti III* falls neatly into this exception to collateral estoppel.  In *Bugliotti III*, the district court held that the Bondholders lost on two independent grounds: (1) that Caja had not at that time conferred on the Bondholders the right to bring suit, *and* (2) that the Bondholders failed to satisfy the reassembly requirement that, the court held, was mandated by Argentine law.  2021 WL 1225971, at *7–8.  It described the first of these issues—obtaining authorization to initiate suit—as an "alternative remedy" to reassembling the Bondholders' FAA

21

Bonds. *Id.* at *9. On appeal, we affirmed on the first ground alone: that the Bondholders lacked authority to enforce the FAA Bonds because Caja had not delegated this authority to the Bondholders. *Bugliotti IV*, 67 F.4th at 105. We were studiously agnostic, however, about the district court's holding with respect to reassembly. All we said on that score was that our conclusion would be the same even if reassembly was not required. *Id.* at 105–06. In short, the district court's holding on reassembly in *Bugliotti III* was an alternative basis for the judgment that was not affirmed on appeal. Accordingly, it is not preclusive.

For similar reasons, the district court erred in holding that the Bondholders were collaterally estopped from broadly relitigating "issues of jurisdiction." *Bugliotti V*, 2024 WL 4349273, at *7. As we have explained, *Bugliotti III* relied on two alternative bases for its holding that the Bondholders had failed to establish jurisdiction in New York—Caja's failure to authorize the Bondholders to sue on the bonds, and the Bondholders' failure to reassemble the bonds—both of which precluded the Bondholders from invoking the jurisdiction-granting provisions of the FAA. When this occurs, the preclusion analysis looks to whether each of the alternative bases was affirmed on appeal, not whether the overarching holding was upheld. *See Niagara Mohawk*, 94 F.3d at 754. Here, the district court framed its preclusion analysis around *Bugliotti III's* overarching holding on jurisdiction. This was in error.

Therefore, to determine whether reassembly is a condition precedent to bringing suit on the FAA Bonds, and then to consider

22

whether the Bondholders have now obtained authority to sue in lieu of Caja, this Court must embark on its own examination of Argentine law.

## 2. Reassembly Requirement Under Argentine Law

Under Federal Rule of Civil Procedure 44.1, "the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence" when determining questions of foreign law. Fed. R. Civ. P. 44.1. "Rule 44.1 frees courts to 'reexamine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail." *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 585 U.S. 33, 42 (2018) (internal quotation marks and citation omitted). This extends to appellate courts, which review *de novo* a district court's determination of foreign law under Rule 44.1. *Bugliotti II*, 952 F.3d 413–14.

The parties presented the district court with competing declarations from experienced Argentine lawyers to marshal the pertinent legal authorities on each side of the question of whether Argentine law requires the Bondholders to reassemble their bonds in order to pursue the present lawsuit. For the Republic, Gabriel Bottini attests to the existence of a reassembly requirement. For the Bondholders, Mario A. Carregal and Roberto E. Silva, Jr., argue to the contrary. After reviewing these authorities, the district court concluded that "Argentine law requires Plaintiffs to return the tax-credit certificates and *CCs* to reassemble the bonds to bring suit on the

23

bonds." *Bugliotti III*, 2021 WL 1225971, at *8. The court reasoned that Argentine "precedent indicat[es] that bondholders must reassemble their bonds before exercising any rights related to their bonds." *Id.* Upon our own independent review of the relevant authorities, we conclude that Argentine law does not require reassembly as a condition precedent to suing to recover on the bonds.

The Republic attempts to locate a reassembly requirement in three sources of Argentine law: (1) the Argentine Supreme Court's 2014 decision in *Domec Compania de Artefactos Domésticos S.A.I.C. y F v. Republic of Argentina*, 265/2011, 47-D (Arg. Sup. Ct. Nov. 27, 2014) ("*Domec*"); (2) the Argentine Supreme Court's 2015 decision in *Bugliotti v. Republic of Argentina*, 134/2012 (Arg. Sup. Ct. July 14, 2015) and an "opinion of the public prosecutor" endorsed therein; and (3) Section 5 of the Trust Agreements. However, none of these sources establishes that participants in the Tax Credit Program must reassemble their FAA Bonds before suing to recover on these instruments.

We begin with *Domec*. The Republic and its Argentine-law expert repeatedly cite this opinion as establishing that participants in the Tax Credit Program must reassemble their Bonds before suing to enforce them. We read the Argentine Supreme Court's decision differently.[5] That case involved a public debt exchange offer by the

---

[5] In considering Argentine law, we accord great weight to decisions of the Argentine Supreme Court even though its rulings are not strictly binding on lower courts in the Argentine civil law system which, like most legal regimes based on the continental model, lacks a formal doctrine of vertical *stare decisis*. *See* Alberto

24

Republic pursuant to a 2004 decree, in which bondholders could basically swap out their old FAA bonds for new replacement bonds subject to new terms, even if they had participated in the Tax Credit Program. In order to trade in their bonds, however, the program required bondholders to "reconstitute" (*reconstituir*) their old bonds by tendering any unused *CCs* and *CCFs* to Caja, and to deposit cash in the amount of any *CCs* and *CCFs* that had been paid out. Joint App'x at 428. The Republic devised a similar debt-exchange program in 2010, for participants in the Tax Credit Program who had not taken advantage of the 2004 decree. Like its predecessor, the 2010 program allowed bondholders to swap out their original bonds, but only if they deposited both their unused *CCs* and *CCFs* and an amount of cash equal to any certificates they had already used. After recounting the details of these programs, the Argentine Supreme Court merely held that the Republic's suspension of payments on the FAA Bonds was lawful. Joint App'x at 429 ("Under the above-mentioned conditions and in the then-prevailing emergency situation, it is possible to conclude that the government's decision to suspend the system stipulated in Decree No. 1226/01 . . . was a step that can be considered valid . . . .").

---

F. Garay, *A Doctrine of Precedent in the Making: The Case of the Argentine Supreme Court's Case Law*, 25 Sw. J. Int'l L. 258, 268-73 (2019) (describing the role of judicial precedent in Argentina); Santiago Legarre, *Precedent in Argentine Law*, 57 Loyola L. Rev. 781, 786 (2011) (noting that as a practical matter lower courts in Argentina generally follow on-point cases from the Argentine Supreme Court, but can depart from this precedent where there is good reason to do so).

Nothing in the *Domec* decision suggests that, in order to bring suit on the FAA Bonds in New York, bondholders had to "reconstitute" or "reassemble" the bonds. To the extent that the Argentine Supreme Court discussed reassembly at all, it was only to describe the steps that were explicitly required by government decree for participation in the 2004 and 2010 debt exchange programs. At no point did the Court suggest that a similar reassembly requirement was mandated in other contexts, such as a lawsuit to enforce FAA Bonds. Accordingly, *Domec* does not support the Republic's argument that reassembly was required here.

Nor is the Republic's argument aided by the Argentine Supreme Court's 2015 decision in *Bugliotti v. Republic of Argentina*, 134/2012 (Arg. Sup. Ct. July 14, 2015). In that case, which was part of these Bondholders' challenge to the constitutionality of the Republic's payment moratorium in Argentina, the Argentine Supreme Court issued a brief order endorsing an "opinion of the Public Prosecutor." Joint App'x at 448. That cross-referenced opinion acknowledged a reassembly requirement for participants in the Tax Credit Program who sought to take part in a new "public debt swap." Dkt. No. 36, Exhibit A at 14. But that simply restates the holding in *Domec*: According to the rules of a decree creating a new public debt exchange offer, participants in the Tax Credit Program had to reassemble the underlying bonds if they wanted to swap their *CCs* and *CCFs* for yet another form of Argentine sovereign debt. And, as in *Domec*, the public prosecutor's opinion nowhere suggests an analogous reassembly requirement for creditors who wished to bring

26

suit against the Republic under the terms of the underlying FAA, pursuant to which the FAA Bonds were issued.

Finally, the Republic attempts to locate a reassembly requirement in Section 5 of the Trust Agreements, whereby the Bondholders agreed to the "disassembly of the [FAA Bonds] for their crediting as CCFs or CCs." Joint App'x at 102–03. However, this language at most establishes that the Bondholders agreed to "disassembl[e]" their FAA Bonds when placing them in trust with Caja, for purposes of receiving corresponding certificates for the principal and interest components of the bonds. It does not suggest that, if the Republic were to default on its obligations under the Tax Credit Program, creditors would have to effectively repay all of the interest they had received (or more precisely, the value of the tax credits they had received in lieu of the interest payments), in order to sue the Republic to recoup the unpaid principal.

The Republic has thus failed to demonstrate that Argentine law precludes the Bondholders from proceeding with this suit if they do not first reassemble the Bonds.

The Republic cautions that failure to impose a reassembly requirement for private litigants would enable participants in the Tax Credit Program to double-recover on interest payments that they already received in the form of tax credits. This concern is misplaced. As the Bondholders expressly represented to this Court, they seek to recover only the unpaid principal amounts on their FAA Bonds (plus post-maturity interest on that principal), not any interest that would

27

have been payable on the bonds themselves. *See* Appellants' Reply Br. at 18 (arguing that reassembly "is particularly insupportable for a lawsuit (such as this one) *not seeking to recover bond interest*").

## C. Effectiveness of Commercial Court Authorization

Finally, we turn to whether the Commercial Court's authorization for the Bondholders to sue on the FAA Bonds was effective under Argentine law. Though the district court did not address this issue below, *Bugliotti V*, 2024 WL 4349273, at *3, *7, this Court has discretion to decide when issues should be addressed for the first time on appeal, and it has exercised this discretion to answer purely legal questions. *J.C. v. Reg'l Sch. Dist. 10, Bd. of Educ.*, 278 F.3d 119, 125 (2d Cir. 2002). Here, we take up this issue because the effectiveness of the Commercial Court's authorization to enforce the FAA Bonds is a pure question of Argentine law, the issue has been fully briefed, and remanding for the district court to consider this question in the first instance would delay the pendency of this already long-running suit.

After this Court affirmed dismissal of the Bondholders' prior complaint in *Bugliotti IV*, the Commercial Court issued orders expressly authorizing the Bondholders to sue the Republic for collection on the FAA Bonds, in light of the fact that Caja as trustee had declined to bring such actions. Caja participated in the authorization proceeding and did not object to the Bondholders' application. The Bondholders then initiated the current suit in New York.

The Republic does not dispute that, under the terms of the Trust Agreements and Argentine law, the Bondholders were entitled to seek authorization to enforce the bonds in place of Caja. As the Commercial Court observed, Article 18 of Argentine Law 24,441 (which governed the Trust Agreements at the time they were executed) provided that:

> The trustee is authorized to exercise all actions necessary for the defense of the trust assets, both against third parties and against the beneficiary. *The judge may authorize the trustor or the beneficiary to exercise actions instead of the trustee when the trustee fails to do so without sufficient cause.*

Joint App'x at 40 (emphasis added); *id.* (noting that this provision "was incorporated almost verbatim in Article 1689 of the Civil and Commercial Code of [Argentina]"). The Republic's challenge to the validity of the Commercial Court's ruling is based entirely on an arbitration clause contained in the Section 16 of the Trust Agreements, which provides that the "Parties agree to resolve their disputes [*discrepancias*] through an arbitration procedure, for which purpose they submit to the Permanent Arbitration Tribunal [PAT] of the Buenos Aires Stock Exchange and the application of its regulations, waiving any other jurisdiction that may correspond to them." In the Republic's view, only the PAT—and not the Commercial Court—had competency to authorize the Bondholders to enforce the FAA Bonds. The Bondholders, unsurprisingly, take the opposite position.

29

It is not clear to us that the Republic, as a non-party to the Trust Agreements, has the right to require arbitration of any disputes between Caja and the Bondholders. But we need not resolve this question because, as we explain below, the uncontested proceeding before the Commercial Court did not fall within the scope of the arbitration clause at all.

The parties' disagreement about the scope of the arbitration clause turns on the term "*discrepancias,*" in the phrase "the Parties agree to resolve their disputes [*discrepancias*] through an arbitration procedure . . . ." The parties agree that the word "*discrepancias"* translates here to "disputes." They also agree that under Article 736 of the Argentine Civil and Commercial Procedural Code, which governs the Trust Agreements, the term "dispute" must be read to include "questions."[6] However, the Bondholders' Argentine-law experts also explain, citing "one of the main authorities" on Argentine procedural law, that the term "questions" must be read to mean "the filing of a dispute" or a "controversy." Joint App'x at 464 (citing Lino Enrique Palacio, V *Derecho Procesal Civil* 3779-80 (4th ed. 2011)). They also note that arbitrators cannot be called upon to act in a "voluntary procedural role" under Argentine law. *Id* (citing Palacio, V *Derecho Procesal Civil* at 3779-80). The Republic's expert, by contrast, does not

---

[6] Article 736 provides: "[A]ny question between parties . . . may be submitted to the decision of arbitration judges, either before or after the trial has been instituted and whatever the stage of the trial may be." Joint App'x at 645. In Spanish, this reads: "*Toda cuestión entre partes, excepto las mencionadas en el artículo 737, podrá ser sometida a la decisión de jueces árbitros, antes o después de deducida en juicio y cualquiera fuere el estado de éste.*" *Id.*

cite any Argentine legal authority or scholarly commentary in arriving at a contrary conclusion. [7] We find the Bondholders' interpretation more solidly supported by Argentine authority, and therefore more persuasive.

Applying this interpretation here, the arbitration clause did not require the Bondholders to resort to the PAT to obtain authorization to enforce the FAA Bonds, where Caja informed the Commercial Court that it did not oppose their request and there was accordingly no "dispute" between the parties to be arbitrated. We therefore conclude that the Commercial Court's orders validly authorized the Bondholders to bring the present lawsuit.

## IV. Conclusion

In sum, we hold as follows:

(1) The Bondholders' claims to recover on the GD65 Bonds are time-barred by New York's six-year statute of limitations for contract actions. Their claims to recover on the AR16 Bonds

---

[7] The Republic's other Argentine-law expert, Gabriel Bottini, also opines that "the competent jurisdiction as regards to any matter relating to the Trust Agreement . . . is the Arbitration Tribunal of the Buenos Aires Stock Exchange." Joint App'x at 81. However, Bottini does not discuss whether a voluntary assignment of authority to enforce the FAA Bonds can be adjudicated only in the PAT. Similarly, the Bottini Declaration from the prior district court docket that the Republic cites in its brief contains only an offhanded reference to authorizing the right to enforce the FAA Bonds in arbitration. It does not discuss whether a voluntary authorization, which is presently at issue, falls within the arbitration clause.

31

are timely given the tolling of this limitations period by New York's COVID-era executive orders.

(2) The district court's decision in *Bugliotti III* did not collaterally estop the Bondholders from relitigating the question of whether they were required to reassemble their FAA Bonds before initiating suit.

(3) As a matter of Argentine law, reassembly of the FAA Bonds is not a condition precedent to the Bondholders bringing suit in New York to recover unpaid principal on those bonds.

(4) The orders of Commercial Court No. 9 of Buenos Aires authorizing the Bondholders to sue the Republic over nonpayment of the FAA Bonds were effective under Argentine law and permit the Bondholders to bring this action for the nonpayment of principal on those bonds.

The judgment of the district court is AFFIRMED IN PART, to the extent it dismissed the Bondholders' claims with respect to the GD65 Bonds; it is VACATED IN PART, to the extent that it dismissed the AR16 Bonds; and the case is REMANDED for further proceedings.